**Sylvia COHEN, Appellant,**

**v.**

**LITTLE SIX, INC., d/b/a Mystic Lake Casino, Respondent.**

No. C6–95–928.

Court of Appeals of Minnesota.

Feb. 13, 1996.

Review Granted April 16, 1996.

Clinton Collins, Jr., Janie L. Fink, Clinton Collins & Assoc., P.A., Minneapolis, for appellant.

Steven F. Olson, BlueDog, Olson & Small, P.L.L.P., Minneapolis, Joseph Plumer, McDonough, Wagner & Sherry, P.A., Apple Valley, for respondent.

Considered and decided by RANDALL, P.J., and SHORT and PETERSON, JJ.

## OPINION

SHORT, Judge.

Sylvia Cohen argues an Indian gaming casino is subject to the jurisdiction of Minnesota state courts, and the trial court erred or violated her due process rights by dismissing her personal injury suit against Mystic Lake Casino.

## FACTS

On October 7, 1994, Sylvia Cohen entered Mystic Lake Casino in Prior Lake, Minnesota. As Cohen attempted to sit on a chair in front of a slot machine, the chair "snapped from underneath her," and Cohen fell to the floor. She claims the fall caused injuries that required hospitalization.

Cohen brought a personal injury action against Little Six, Inc. (LSI), d/b/a Mystic Lake Casino. LSI was created by tribal ordinance and is owned and controlled by the Shakopee Mdewakanton Sioux Community ("community"). The community is a federally-recognized Indian tribe, which operates under a constitution approved by the Secretary of the Interior. The casino is located on reservation land.

Without answering the complaint, LSI moved to dismiss on the basis of lack of jurisdiction. The trial court held LSI enjoys sovereign immunity, and dismissed Cohen's lawsuit for want of jurisdiction.

## ISSUES

I. Do Minnesota state courts have jurisdiction over a dispute in which the sole defendant is a tribal business corporation, controlled by the tribe for governmental purposes, and the underlying events occurred entirely on an Indian reservation?

II. Does dismissal for want of jurisdiction violate Cohen's right to due process?

## ANALYSIS

The jurisdiction of courts and the constitutionality of state action present questions of law, which we review de novo. *Rupp v. Omaha Indian Tribe*, 45 F.3d 1241, 1244 (8th Cir.1995) (reviewing the trial court's jurisdictional rulings de novo); *see Estate of Jones v. Kvamme*, 529 N.W.2d 335, 337 (Minn.1995) (evaluating the constitutionality of a statute de novo). We are asked to decide whether state courts possess jurisdiction over a tort claim brought against a tribal corporation, controlled by the tribe for governmental purposes, for injuries sustained on the reservation and whether dismissal for want of jurisdiction infringes on Cohen's constitutional right to due process.

### I.

While sovereign immunity and lack of subject matter jurisdiction both deprive courts of the authority to hear certain matters, they differ in that parties may waive the former jurisdictional defect, but not the latter. *In re Prairie Island Dakota Sioux*, 21 F.3d 302, 304–05 (8th Cir.1994).

#### A. *Sovereign Immunity*

Indian tribes have long possessed the immunity enjoyed by sovereigns at common law. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106 (1978). While Congress has enacted many exceptions to the absolute immunity enjoyed by *foreign* sovereigns, these restrictions do not apply to sovereign Indian communities. *In re Greene*, 980 F.2d 590, 594 (9th Cir.1992), *cert. denied*, —— U.S. ——, 114 S.Ct. 681, 126 L.Ed.2d 649 (1994); *see Sac & Fox Nation v. Hanson*, 47 F.3d

1061, 1064–65 (10th Cir.) (refusing to apply "commercial exception" of the Foreign Sovereign Immunities Act to Indian communities), *cert. denied,* —— U.S. ——, 116 S.Ct. 57, 133 L.Ed.2d 21 (1995); *see also* 28 U.S.C. §§ 1602–1611 (1988) (Foreign Sovereign Immunities Act of 1976). Absent a clear congressional or tribal waiver, common law notions of immunity apply to Indian tribes. *Sac & Fox Nation,* 47 F.3d at 1063 (quoting *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe,* 498 U.S. 505, 509, 111 S.Ct. 905, 909, 112 L.Ed.2d 1112 (1991) and *Santa Clara Pueblo,* 436 U.S. at 58, 98 S.Ct. at 1677). Any waiver must be express and unequivocal and cannot be implied. *Santa Clara Pueblo,* 436 U.S. at 58–59, 98 S.Ct. at 1677 (quoting *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953–54, 47 L.Ed.2d 114 (1976) (quoting *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 1503, 23 L.Ed.2d 52 (1969))).

■ Cohen argues the trial court erred in allowing LSI, a separate legal entity, to assert the tribe's sovereign immunity as a jurisdictional defense. However, case law establishes that a corporation organized under tribal laws, controlled by the tribe, and operated for governmental purposes can assert the tribe's immunity as a defense. *See, e.g., Elliott v. Capital Int'l Bank & Trust,* 870 F.Supp. 733, 733–35 (E.D.Tex.1994) (dismissing, on immunity grounds, an action against a limited liability bank, which was chartered, governed, and owned by an Indian tribe); *Namekagon Dev. Co. v. Bois Forte Reservation Housing Auth.,* 395 F.Supp. 23, 26 (D.Minn.1974) (acknowledging tribes can confer immunity upon tribally-owned and -created corporations), *aff'd,* 517 F.2d 508 (8th Cir.1975); *Duluth Lumber & Plywood Co. v. Delta Dev., Inc.,* 281 N.W.2d 377, 378, 383–84 (Minn.1979) (determining a tribally-created corporation fulfilling a governmental purpose was equivalent to the tribe, but lacked sovereign immunity because of an express *waiver* ); *see also Dixon v. Picopa Constr. Co.,* 160 Ariz. 251, 256–258, 772 P.2d 1104, 1109–11 (1989) (holding a tribally-created corporation did not enjoy immunity because it was a simple business venture, hav-

ing no responsibility for promoting tribal welfare or development). This approach is consistent with applications of the absolute common law immunity formerly enjoyed by foreign sovereigns. *See, e.g., In re Investigation of World Arrangements with Relation to the Production, Transportation, Refining & Distribution of Petroleum,* 13 F.R.D. 280, 288–91 (D.D.C.1952) (recognizing a corporation's power to invoke sovereign immunity because it was organized under British law, was controlled by the British government, and served the government's purpose of ensuring access to oil). Even under the restrictive view of sovereign immunity, corporations owned by foreign governments are entitled to assert immunity unless they fall within an exception contained in the Foreign Sovereign Immunities Act. 28 U.S.C. §§ 1603(a) (a "foreign state" includes its agencies and instrumentalities), 1603(b) (an "agency or instrumentality of a foreign state" includes an entity in which the foreign state holds a majority share), 1604 (a "foreign state" enjoys immunity unless it falls within one of the act's exceptions).

■ The record establishes: (1) LSI was created by tribal ordinance; (2) the community owns LSI's single share of stock; (3) members of the tribe's General Council may call special meetings of the corporation; (4) all community members may vote at LSI meetings; (5) LSI cannot exercise many of its powers, including approval of its annual budget, without consent of the tribe's voting members; and (6) LSI's purpose, as set forth in its articles of incorporation, is to "seek * * * to improve the business, financial, or general welfare of the Corporation, the Members of the Corporation, and the Community." Raising revenue and redistributing it for the welfare of a sovereign nation is manifestly a governmental purpose. Because the tribe created, owns, and controls LSI to further a legitimate governmental purpose, LSI is entitled to assert the tribe's sovereign immunity. *But see Gavle v. Little Six, Inc.,* 534 N.W.2d 280, 284 (Minn.App.1995) (considering LSI's activities nongovernmental in

nature), *review granted* (Minn. Sept. 28, 1995).[1]

◼ Cohen also argues operation of a gaming hall under the authority of the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701–2721 (1988 & Supp. V 1993), is a waiver of sovereign immunity. However, that statute creates only a limited waiver. *See Maxam v. Lower Sioux Indian Community*, 829 F.Supp. 277, 281–82 (D.Minn.1993) (holding the IGRA waives sovereign immunity for enforcement actions, but not suits for money damages); *Ross v. Flandreau Santee Sioux Tribe*, 809 F.Supp. 738, 745 (D.S.D. 1992) (same); *see also Davids v. Coyhis*, 869 F.Supp. 1401, 1407, 1410 (E.D.Wis.1994) (holding the IGRA *does not* waive sovereign immunity even for enforcement actions). LSI's operation of a gaming hall subjects it to a non-tribal court's authority to enforce compliance with the IGRA, not claims for money damages.

◼ Cohen also argues the community waived sovereign immunity by registering as a foreign corporation in Minnesota. *See* Minn.Stat. § 303.13, subd. 1 (1994) (subjecting registered foreign corporations to service of process). However, appointment of an agent for the service of process waives only personal jurisdiction defenses, not sovereign immunity. *Canadian Overseas Ores v. Compania de Acero Del Pacifico*, 528 F.Supp. 1337, 1346 (S.D.N.Y.1982), *aff'd*, 727 F.2d 274 (2nd Cir.1984); *see Duluth Lumber*, 281 N.W.2d at 383 (holding that an entity subject to state court jurisdiction may still assert sovereign immunity as a defense).

◼ Cohen further argues registration as a foreign corporation constituted a waiver of sovereign immunity because foreign corporations "shall be subject to the laws of this state." Minn.Stat. § 303.09 (1994). While that statute provides a means

of gaining personal jurisdiction, it does not waive sovereign immunity. *See Rykoff–Sexton, Inc. v. American Appraisal Assocs.*, 469 N.W.2d 88, 90 (Minn.1991) (applying the statute as a means of gaining personal jurisdiction); *State ex rel. Ohsman & Sons v. Starkweather*, 214 Minn. 232, 235–36, 7 N.W.2d 747, 748–49 (1943) (describing the statute's function as a method of achieving personal jurisdiction over a foreign corporation); *see also Canadian Overseas Ores*, 528 F.Supp. at 1346 (submission to personal jurisdiction does not waive sovereign immunity); *Duluth Lumber*, 281 N.W.2d at 383 (concluding that, even if the court otherwise had jurisdiction, tribal sovereign immunity might bar suit). Even if we concluded the statute amounted to a choice-of-law provision, there is no basis on which to find a clear and unequivocal waiver of sovereign immunity. *See American Indian Agric. Credit Consortium v. Standing Rock Sioux Tribe*, 780 F.2d 1374, 1379–81 (8th Cir.1985) (finding no waiver of sovereign immunity in a promissory note containing a choice-of-law clause). While a choice-of-law clause sets forth the rules governing the parties' duties and obligations, it does not constitute an explicit statement that the parties have agreed to submit disputes regarding those rules to adjudication in a particular forum. *See id.* at 1380–81 (implying courts should not transform a choice-of-law clause into a choice of forum). By registering in Minnesota as a foreign corporation, the community did not unequivocally waive sovereign immunity.

B. *Subject Matter Jurisdiction* [2]

◼ By virtue of the United States Constitution, the federal government enjoys paramount authority over Indian tribes. *Williams v. Lee*, 358 U.S. 217, 219–20 & n. 4, 79 S.Ct. 269, 270 & n. 4, 3 L.Ed.2d 251 (1959); *Maryland Casualty Co. v. Citizens*

---

1. However, under a common law sovereign immunity analysis, the activity's purpose, not its nature, controls the result. *See In re World Arrangements*, 13 F.R.D. at 288–91 (recognizing the immunity of governmental corporation because of the purpose it served).

2. Although the trial court never reached the question, LSI argues Minnesota state courts lack subject matter jurisdiction over this case. While we typically review only questions decided by the

trial court, subject matter jurisdiction presents an issue falling outside of this general rule. *See* Minn. R. Civ. P. 12.08(c) (providing that a party may question subject matter jurisdiction at any time); *Berke v. Resolution Trust Corp.*, 483 N.W.2d 712, 714 (Minn.App.1992) (resolving a claimed lack of subject matter jurisdiction raised for the first time on appeal), *review denied* (Minn. May 21, 1992).

*Nat'l Bank,* 361 F.2d 517, 520 (5th Cir.), *cert. denied,* 385 U.S. 918, 87 S.Ct. 227, 17 L.Ed.2d 143 (1966). Thus, state courts cannot exercise subject matter jurisdiction over Indians or activities on Indian lands unless a federal statute provides for such jurisdiction, or the exercise of jurisdiction will not infringe upon Indians' right to self-governance. *Williams,* 358 U.S. at 220, 79 S.Ct. at 270–71; *Duluth Lumber,* 281 N.W.2d at 380–82.

■ Public Law 280 (28 U.S.C. § 1360(a) (1988)) provides Minnesota state courts shall, except with regard to activities occurring on the Red Lake Reservation, "have jurisdiction over civil causes of action between Indians or to which Indians are parties." While Public Law 280 applies to actions involving "Indians," this grant of jurisdiction does not apply to Indian *tribes,* thus preserving the vitality of Indian sovereignty and preventing the transformation of Native American communities into "little more than 'private, voluntary organizations.'" *Bryan v. Itasca County, Minn.,* 426 U.S. 373, 388–89, 96 S.Ct. 2102, 2111, 48 L.Ed.2d 710 (1976) (quoting *United States v. Mazurie,* 419 U.S. 544, 557, 95 S.Ct. 710, 718, 42 L.Ed.2d 706 (1975)). Thus, the federal statute's jurisdictional gap protects against infringement on the tribe's status as a sovereign. *See Parker Drilling Co. v. Metlakatla Indian Community,* 451 F.Supp. 1127, 1139 (D.Alaska 1978) (construing Public Law 280 as having more in common with sovereign immunity than with traditional notions of subject matter jurisdiction). Under these circumstances, it would be illogical to impute the tribe's status to LSI for sovereign immunity purposes, but to prevent LSI from sharing other jurisdictional defenses designed to safeguard the tribe's sovereign status. *See In re World Arrangements,* 13 F.R.D. at 290–91 (allowing a British corporation to assert sovereign immunity because it was owned and controlled by Britain for a governmental purpose and, thus, was indistinguishable from the sovereign). As a con-

sequence, we construe Public Law 280 as inapplicable to tribal corporate entities that are equivalent to the tribe for purposes of sovereign immunity. *See Bryan,* 426 U.S. at 388–89, 96 S.Ct. at 2111 (holding Public Law 280 does not confer jurisdiction over *tribes* ); *Duluth Lumber,* 281 N.W.2d at 378, 383–84 (treating a tribally-created corporation, serving a governmental purpose, as the tribe); *cf. Parker Drilling,* 451 F.Supp. at 1139 (holding a federally-incorporated tribe not to be an "Indian" for purposes of Public Law 280).

■ In the absence of a federal law authorizing state court jurisdiction, states may exercise jurisdiction over matters involving Indians if doing so will not infringe on their right to self-governance. *Williams,* 358 U.S. at 220, 79 S.Ct. at 270–71; *Duluth Lumber,* 281 N.W.2d at 380–82. If jurisdiction does not attach under Public Law 280 and the disputed events occurred wholly within the confines of an Indian reservation, state court jurisdiction over the matter interferes with tribal self-governance. *Duluth Lumber,* 281 N.W.2d at 382. Because we conclude jurisdiction is unavailable under Public Law 280 and the events giving rise to Cohen's cause of action transpired wholly within the reservation, we lack authority to hear the merits of this action.[3]

## II.

■ Cohen argues the jurisdictional immunities afforded to Indian tribes leave her without a remedy and, thus, violate her right to due process. We disagree. Cohen has not been deprived of her day in court, but only of her day *in the court of her choice.* *See Bank of Okla. v. Muscogee (Creek) Nation,* 972 F.2d 1166, 1169 (10th Cir.1992) (finding no due process violation in the relegation of the plaintiff's claim to tribal court). Moreover, there is no state action that is

---

3. Even if the trial court had concurrent subject matter jurisdiction over this dispute, federal policy would *require* it to abstain from acting with regard to the matter until after its final resolution in tribal court. *See Bowen v. Doyle,* 880 F.Supp. 99, 123, 127 (W.D.N.Y.1995) (holding even if they have jurisdiction and the matter is not currently pending before a tribal court, state courts

must abstain from hearing suits arising on reservations until after tribal courts have resolved the matter); *Smith v. Babbitt,* 875 F.Supp. 1353, 1366–67 (D.Minn.1995) (stating a non-tribal court must abstain from hearing a matter arising on Indian land until the plaintiff has exhausted its remedies in tribal court).

necessary to a due process claim; the tribe's assertion of sovereign immunity is not an affirmative act, but a claim of status. *Greene*, 980 F.2d at 596. Similarly, a proper dismissal for lack of jurisdiction serves merely as recognition of the court's lack of authority to act. *See Duenow v. Lindeman*, 223 Minn. 505, 511, 27 N.W.2d 421, 425 (1947) (quoting *Sache v. Wallace*, 101 Minn. 169, 172, 112 N.W. 386, 387 (1907) and stating subject matter jurisdiction is the "authority to hear and determine the particular questions the court assumes to decide").

## DECISION

First, LSI may assert the tribe's sovereign immunity. Second, no federal statute authorizes state jurisdiction over this case and state court jurisdiction would infringe on tribal self-governance. And third, by dismissing this action for want of jurisdiction, the trial court did not violate Cohen's right to due process.

**Affirmed.**

RANDALL, Judge (dissenting).

A treaty is a contract.

A contract is a promise.

"The government made us many promises, more than I can remember, they never kept but one, they promised to take our land and they took it."

Red Cloud (Mahpiua Luta)

Oglala Lakota

The government could not keep its own citizens out of the Sioux lands, any more than it had been able to keep them out of any other Indian treaty land, in spite of solemn pledges, since the time when the land just across the Appalachians was the West. It was now up to the Indian Bureau to find some way to legalize this latest trespass.

\* \* \* \*

Actually, there was no writing of treaties with Indian tribes after 1871, when the *entire ridiculous pretense that tribes were sovereignties* was abolished. It would be pleasant to be able to report that the change was made because common sense prevailed, but such was not the case.

Ralph K. Andrist, *The Long Death: The Last Days of the Plains Indian* 246 (1993) (emphasis added).

Justice Blackmun, in *Puyallup Tribe, Inc. v. Department of Game State of Wash.*, expressed doubts about the "continuing vitality in this day of the doctrine of tribal immunity" and suggested that "the doctrine may well merit re-examination in an appropriate case." 433 U.S. 165, 178–79, 97 S.Ct. 2616, 2624, 53 L.Ed.2d 667 (1977)(Blackmun, J., concurring). Justice Stevens later declared the doctrine of sovereign immunity to be "founded upon an anachronistic fiction." *Oklahoma Tax Comm'n v. Potawatomi Indian Tribe*, 498 U.S. 505, 514, 111 S.Ct. 905, 912, 112 L.Ed.2d 1112 (1991)(Stevens, J., concurring).

> Moreover, mere casual inquiry reveals that by and large the governmental powers actually exercised by contemporary tribal governments are those gratuitously granted by the federal government. Those powers are found in the Indian Reorganization Act of 1932, an Act of the United States Congress. Besides being severely limited in scope, those powers can be amended, or eliminated for that matter, at the whim of Congress. Thus, the governmental powers exercised by contemporary tribal governments are more illusion than real.

Robert A. Fairbanks, *The Tribal Sovereignty More Illusion Than Real*, The Native American Press/Ojibwe News, Nov. 3, 1995, at 4.

I respectfully dissent. As the majority sets out, appellant Sylvia Cohen was injured in the Mystic Lake Casino in Prior Lake, Minnesota. The casino is managed by respondent Little Six, Inc. (LSI), d/b/a Mystic Lake Casino. LSI is a branch and a part of the Shakopee Mdewakanton Sioux (Dakota) Reservation. Appellant commenced a standard personal injury action against respondent in the Minnesota District Court for Scott County, wherein the Shakopee reservation lies.

Respondent essentially asserts that the Mystic Lake Casino is an authorized branch of the tribal government of the reservation and thus asserts that the reservation is im-

mune from lawsuits of this type, subject to certain narrow exceptions. It asserts that no such exception exists here.

## I.

*Sovereignty*

Respondent's primary defenses center around its contention that Indian tribes are "sovereign" and thus may exercise inherent sovereign powers, which include immunity from lawsuits, unless they expressly waive this "sovereign immunity" and consent to be sued.

Respondent raises other arguments as well, all of which have the claim of sovereignty at their core. For example, it argues that the reservation's tribal court has original jurisdiction over this matter, if anyone does, and appellant must first take her claim to tribal court. Respondent additionally argues its casino is a tribal enterprise and that reservation's interests strongly outweigh the state's interest in providing Minnesota citizens access to Minnesota district courts for civil lawsuits. Respondent further argues that appellant's lawsuit impermissibly infringes on tribal interests that have been recognized by the federal government and that those tribal interests include an Indian tribe's right to protect its tribal assets, its culture, its identity, its religion or spirituality, and its right to self-governance and self-determination. All of these arguments are based on sovereignty.

Respondent concedes there are already many recognized inroads to this concept of "sovereignty." There may be federal and state jurisdiction over criminal matters on Indian reservations. Public Law 280, which includes the State of Minnesota, specifically confers certain jurisdiction on state district courts for incidents happening on reservations. *See* 28 U.S.C. § 1360(a) (granting Minnesota courts limited civil jurisdiction over actions "between Indians or to which Indians are parties" and "which arise in the areas of Indian Country"). Respondent argues that Public Law 280 does not apply to this set of facts because it, as a defendant in a personal injury lawsuit, is not an individual Indian, but is an Indian tribal enterprise, and that Public Law 280, to date, has been con-

strued to not include tribes within its purview. *See, e.g., Bryan v. Itasca County*, 426 U.S. 373, 389, 96 S.Ct. 2102, 2111, 48 L.Ed.2d 710 (1976). Be that as it may, the already recognized exceptions to claims of sovereignty are incompatible with any belief that there is true sovereignty on Indian land. True sovereignty and true immunity from Minnesota state courts and this country's federal courts exists in Canada and Mexico, for instance. Our neighbors to the north and south are, in every sense of the word, true sovereign states or sovereign nations. The reason is simple. They are not in the United States. On the other hand, respondent is in Minnesota, on Minnesota and U.S. land, and the reason for that is simple. Respondent is a Minnesota corporation, its residents are all full-blown Minnesota citizens and full-blown U.S. citizens, and respondent and its residents are every bit a part of this state, a part of this country, as the rest of Minnesotans.

The majority notes that respondent, to buttress its claim of sovereign immunity, registered as a "foreign" corporation in Minnesota. Respondent accurately describes itself as "a corporation wholly-owned and operated by a federally recognized Indian Tribe (the Shakopee Mdewakanton Sioux (Dakota) Community)." I agree with respondent's characterization. If the Minnesota Secretary of State allowed filing as a foreign corporation, either because respondent is an Indian tribe, or because respondent incorporated in Delaware or some other state, but registered here to do business here, it changes nothing.

As respondent states, it is the Shakopee Mdewakanton Sioux (Dakota) Community. Although the Plains Indians moved around hundreds of years ago without regard to the political borders we call "states," respondent, a branch of the Sioux Nation, has its historical roots in Minnesota. Virtually all of Minnesota at one time was "Dakota Country." A few hundred years ago, the Anishinabe Ojibwe, after a protracted and fierce struggle, drove the Dakota people south and west out of central Minnesota. But respondent's official name, "Mdewakanton," which they bear proudly, roughly translates into "Dwellers of the Spirit Lake." Spirit Lake, or Mystic Lake, is Lake Mille Lacs. Thus,

respondent is historically grounded in Minnesota. Its official name, Mdewakanton, meaning literally from the Lake Mille Lacs area of Minnesota, distinguishes it from other branches of the Sioux Nation. The Yankton (South Dakota), and other subdivisions of the Teton Sioux (as respondent is) are also historically grounded in identifiable areas in a particular state. The Minniconju Sioux (Teton) are associated with the Cheyenne River reservation (South Dakota); the Hunkpapa Sioux (Teton) with the Standing Rock reservation, which borders North and South Dakota; the Oglala Sioux (Teton) are associated with the Pine Ridge reservation in South Dakota, and so on.

Further, all residents of respondent, including respondent's board of directors, elected chief, and council members, are full-bodied residents of the State of Minnesota. They are entitled to vote in Minnesota, go to public schools if they choose, run for public office in Minnesota if they choose, and in every bit of the term, are full normal Minnesotans. Minnesota owes them that. They are. Respondent's residents do not vote in state and national elections in North or South Dakota, or Iowa, or Wisconsin. They are not residents of those states. Regardless of what state respondent chose for incorporation, its reservation, its people, its casino at issue, its headquarters, and its home land are in Minnesota. Thus, I will continue to use the term Minnesota corporation to describe respondent. If another court should choose to call respondent a foreign corporation, it would change neither my legal analysis one line, nor history one day.

Continuing on, as Andrist said, "the entire ridiculous pretense that tribes [are] sovereignties" should have been done away with a long time ago. Andrist, *The Long Death* at 246.

During World War II and the Vietnam War, a test of sovereignty presented itself. Essentially, American Indians raised the issue of whether they were citizens of the U.S. subject to the draft or whether they were sovereign or quasi-sovereign inhabitants of a sovereign or quasi-sovereign reservation and, thus, not subject to the draft. The federal courts listened politely and then ruled immediately that American Indians were U.S. citizens subject to the draft. *See, e.g., United States v. Rosebear,* 500 F.2d 1102 (8th Cir. 1974) (holding that induction of Indian, who was United States citizen within the meaning of the Selective Service Act, is not precluded from military service by quasi-sovereignty of Indian nations, lack of full citizenship by Indian people, or treaty commitments); *Williams v. United States,* 406 F.2d 704 (9th Cir.1969), *cert. denied* 394 U.S. 959, 89 S.Ct. 1307, 22 L.Ed.2d 561 (1969) (holding member of Western Shoshone Nation of Indians subject to Universal Military Training and Service Act and not exempt by Treaty between the United States and Western Shoshone); *Ex Parte Green,* 123 F.2d 862 (2d. Cir.1941) (holding that even if treaty status between U.S. and Indian tribe were valid, Congressional action superseded the treaties and made tribe member a citizen for purposes of WWII military service); *United States v. Cook,* 383 F.Supp. 353 (N.D.N.Y.1974) (holding that appellant was subject to Military Service Act of 1967 even though a member of Six Nations of Indians); *United States v. Craig,* 353 F.Supp. 121 (D.Minn.1973) (court found no inconsistency in recognizing certain unique Indian rights pertaining to modes of self-government, hunting and fishing rights and in deeming Indians to be citizens within the meaning of Selective Service law.)

I am not at all surprised by the result. I can only note that, in time of war, this country has accepted volunteers from true foreign or sovereign countries. But we have not been in the habit of involuntary induction, drafting against their will, bona fide citizens of sovereign nations.

It can be noted that during World War II, foreign born people residing in America, who had not yet been naturalized or in other ways attained citizenship, were subject to the military draft. But the point is still made, as those foreign born residents were drafted only because they resided in the U.S. We were not drafting tourists from foreign countries nor were we drafting foreign born non-residents from foreign countries. We were drafting them because they lived here. In contrast, the American Indian's position was they could not be drafted off the reservation

because it was sovereign or quasi-sovereign soil. That argument failed completely.

If during World War II and the Vietnam War we had drafted (with serious criminal penalties for refusal) sovereign or quasi-sovereign American Indians off of sovereign or quasi-sovereign non-American soil, and sent them to war, to fight honorably, to put themselves in harm's way, to suffer serious injury and death, I would like to be the lead plaintiff's attorney in that class action lawsuit. However, there never was nor will there be any such lawsuit because, in truth, we were not doing anything of the kind. We were drafting full-blown U.S. citizens, residents of the individual states, into the armed forces, to serve honorably along with all other draftable males regardless of race or color.

While overseas and under fire, the American Indian was accepted and fully integrated. Why, when he returned to this country, do we put him back on a private enclave, unlike all other returning soldiers of color, and tell him that as long as you stay there, you are on some sort of "sovereign soil?" To me, it is the cruelest kind of joke, to trumpet "sovereignty," as we do here, by forbidding appellant, a Minnesotan, from suing a Minnesota corporate entity in Minnesota state court; but in time of war, this great shield of sovereignty is exposed for what it truly is, a Potemkin Village.

Respondent's brief repeats a long line of federal and state cases discussing the issues of Indian sovereignty. One of the seminal cases that respondent cites in support of its position and one that has never been expressly overruled is *Cherokee Nation vs. State of Georgia* decided in 1831. 30 U.S. (5 Pet.) 1, 8 L.Ed. 25 (1831). Actually, *Cherokee Nation* sets the record straight. The case sets out unequivocally that Indian tribes are not true sovereign states or nations. *Cherokee Nation* labelled the tribes "domestic dependent nations." *Id.* at 17. *Cherokee Nation* is accurate when it uses the term "domestic" as, by definition, American Indian tribes are in the U.S., not a foreign country. *Cherokee Nation* is totally accurate when it uses the term "dependent". The federal government has made Indian tribes wards of government since this country was founded

right up to the present. I suggest this acknowledged dependency is not compatible with any claim of true sovereignty. *See Id.* (stating "[t]heir relation to the United States resembles that of a ward to his guardian.")

The Indian tribes' virtual total dependence on the federal government for money, grants, permission to build this, permission to buy or sell that, permission to get into the casino business, etc., is exemplified by the partial federal government shutdown in late 1995 and early 1996. Articles appeared in various Indian and non-Indian newspapers detailing the hardships on reservations because of the slow down or shutoff of the Bureau of Indian Affairs and other sources of federal support.

The federal government views its obligations to Indian reservations as real and mandatory. In contrast, unlike how we view foreign aid to true sovereign nations as an optional decision of each Congress and President.

Respondent, with its successful Mystic Lake Casino, and the Mashantucket Pequot, with its successful Foxwood Resort and Casino in Connecticut, may be exceptions to tribal dependency. But these two tribal casinos, out of the few hundred now dotting this country, are true exceptions.

In large parts of this country, the rule for reservations is that poverty, lack of adequate housing, medical care, educational opportunities, and work equal or surpass that of many Third World countries. This problem is partially due to the continuous conflicts between state law, federal law, and tribal constitutions, with the end result being there is often is no true line to authority with the power to look into conditions and issues and rule with the force of law what has to be done to correct the situation. On the other hand, townships, villages, cities, counties, etc. in the State of Minnesota have a known rule of law, state statutes and the Minnesota Constitution, to operate under, and its citizens have a clear line to a neutral detached judicial body with the power to hear and redress wrongs. We call it the Minnesota District Court system.

If we are honest, we must concede that hopes for a thriving multi-million dollar casi-

no like Mystic Lake or Foxwood on every reservation, to cure all ills, is no hope at all. There is no guarantee the few eminently successful Indian casinos will have the ability forever to continue at their present levels. More importantly, there is absolutely no way that every single tribe in this country, large and small alike, will have a Foxwood or a Mystic Lake. The 50 states could not possibly absorb 500 to 2500 casinos of this type, of this size. We need to concede, because we must concede, that it would be impossible for all 50 states to have the equivalent of a Las Vegas and a Reno within their borders. That many casinos would kill each other off and drain vast amounts of money out of other businesses. The real issue is why are we putting the American Indian in a position where unless they get a successful casino off the ground, they remain in utter poverty. On some of the poorer Indian reservations in this country, their theoretical right to negotiate with the state for a gambling compact (providing they can entice outside investors and outside professional consultants into helping them in return for a large piece of the pie), would likely be traded for a chance at a real job, and a hot meal. Put another way, on what other class of our citizens do we impose the obligation to put up a gambling casino or some other economic enterprise before they are deemed worthy of the normal help and assistance we give to non-Indian Americans who do not have to first claim to be residents of some sovereign entity or tribe?

The truth of the matter is, Indian reservations and their inhabitants are semi-dependent or totally dependent wards of the federal government. This is reality. It is not sovereignty.

But somehow, through the years, "domestic dependent nation" has come to be used interchangeably with "sovereign state", or "quasi-sovereign state", or "sovereign tribes", and different variations thereof.

Thus, the core issue which needs to be addressed prior to developing the actual facts of this case and discussing other issues such as tribal courts, self-determination, and the unquestioned need to protect Indian identity, culture, spirituality, and dignity, is sovereignty.

Any hint in *Cherokee Nation* (if there was any), and any inference or outright statement in any of its progeny that purports to treat Indian tribes as sovereign or quasi-sovereign entities was mush when it was written, and is mush today. "Dependent," yes. "Sovereign," not now, not ever. I do not care what we have said or put in writing. Our actions speak louder than our words. Sovereignty is a phrase we have mouthed for over 200 years, but this country has never, at any time, treated Indian tribes with any of the courtesy, nor respect accorded a true sovereign state or nation, such as a Canada, Mexico, Great Britain, etc. None of the normal attributes of a true sovereign nation or foreign county has ever been gifted to, or attributed to, Indian tribes. Real sovereignty includes, without limitation, the right to seal one's borders, declare war, make peace, coin one's own currency, design and distribute one's own postage stamps, nationalize essential industries such as radio, telephone, communications, steel, oil, nationalize industries belonging to foreigners, control immigration, set quotas, forbid emigration, apply for a seat in the United Nations, etc. Sovereignty is defined as:

> The supreme, absolute, and uncontrollable power by which any independent state is governed; supreme political authority; paramount control of the constitution and frame of government and its administration; the self-sufficient source of political power, from which all specific political powers are derived; the international independence of a state, combined with the right and power of regulating its internal affairs without foreign dictation; also a political society, or state, which is sovereign and independent.
>
> The power to do everything in a state without accountability,—to make laws, to execute and to apply them, to impose and collect taxes and levy contributions, to make war or peace, to form treaties of alliance or of commerce with foreign nations, and the like.

Black's Law Dictionary, 1251 (5th ed. 1979).

Indians and Indian tribes, on the other hand, have been treated by this country, at

times, in a way that would not be countenanced by the Geneva Convention or any of its predecessor rules of war controlling the treatment of prisoners and combatants.

*Cherokee Nation* itself is instructive. It discussed the intentions of the State of Georgia to uproot the Cherokee Nation from its historical lands and bodily force it out of the state at gunpoint in violation of a treaty. The *Cherokee Nation* court indicated that there might be an injustice here, but solemnly concluded the poor Indians had no standing to sue and that the United States Supreme Court had no jurisdiction to hear their plea. In so holding the court stated:

> If it be true that the Cherokee Nation have rights, this is not the tribunal in which those rights are to be asserted. If it be true that wrongs have been inflicted, and that still greater are to be apprehended, this is not the tribunal which can redress the past or prevent the future.
>
> The motion for an injunction is denied.

*Cherokee Nation*, 30 U.S. at 20.

The *Cherokee* court did leave us with the following:

> Though the Indians are acknowledged to have an unquestionable, and, heretofore, unquestioned right to the lands they occupy until that right shall be extinguished by a voluntary cession to our government, yet it may well be doubted whether those tribes which reside within the acknowledged boundaries of the United States can, with strict accuracy, be denominated foreign nations. *They may, more correctly be denominated domestic dependent nations.* They occupy a territory to which we assert a title independent of their will, which must take effect in point of possession when their right of possession ceases. *Meanwhile they are in a state of pupilage. Their relation to the United States resembles that of a ward to his guardian.*
>
> They look to our government for protection; rely upon its kindness and its power; appeal to it for relief to their wants; and address the President as their great father. *They and their county are considered by foreign nations, as well as by ourselves, as being so completely under the sovereignty and dominion of the United States,* that any attempt to acquire their lands, or to form political connection with them, would be considered by all as an invasion of our territory, and an act of hostility.

*Id.* at 17 (emphasis added).

Following *Cherokee Nation,* and other cases solemnly discussing Indian sovereignty, and right on through the rest of the 19th Century, as we pushed west to the Pacific Ocean, we either bought below the market price or stole virtually every acre of Indian land between the East Coast and the West Coast. During that time span, with dozens, if not hundreds, of state and federal court cases ringing with the solemn term "sovereignty", "domestic dependent nation", etc., this country was responsible for the Cherokee Trail of Tears in 1830; the Navajo Long Walk in the 1860s; the Sand Creek Massacre at Washita River in 1864; the violation of the Fort Laramie Treaty of 1868; the lengthy battle against Chief Joseph of the Nez Perce in the 1870s; the Wounded Knee Massacre of 1890; and other similar actions, too numerous to mention (but can be looked up and verified), totally incompatible with any version of sovereignty. Look at what we do, not what we say.

Could this conduct be justified if individual Indians were true foreign nationals of a true sovereign or foreign state? The answer is, of course not. This country, at its worst, has always given some nod to the rules of war, even under the most trying of combat conditions. The history of Indian warfare lacks this nod.

The history of Indian "warfare" lacks even the pretense that we were warring against sovereignties, as Congress and the President did not bother to go through the formalized process of declaring war against the Indians that we went through in the colonial war for independence, World War I, and World War II. At one time anyway, the formalized process by which Congress and the President declared war was thought essential to our concept of honor. Indian warfare, including the intentional killing of noncombatants, women, and children, proceeded without this honor.

Could this conduct be justified because it was not until 1924 that the U.S. government got around to acknowledging that American Indians were official citizens of the United States? *See* Act of June 2, 1924, ch. 233, 43 Stat. 253, 8 U.S.C. § 3, (now included in 8 U.S.C. § 1401). No, I do not think so. In roughly the same time frame, from 1800 to 1900, as we moved west and absorbed Indian country, the great waves of immigrants came to the United States. When they arrived, immigrants were all true foreign nationals of true foreign states. Although many, because of poverty, had to walk or ride by boxcars to homes and jobs, none were forcibly herded into boxcars at the point of a gun. None were taken hundreds of miles from lands that were concededly theirs and where they wished to live, to lands hundreds of miles away that were not theirs and where they did not wish to live. Only Indians.

The Fort Laramie treaty of 1868, and the history of the Black Hills, with its identity to the Plains Indians, particularly the Lakota/Dakota Sioux, Cheyenne, Arapaho, are instructive, cannot be denied, and represent, oh so well, our treatment of Indians and Indian tribes as a so-called sovereign people. First of all, to get from the East Coast to the Black Hills in South Dakota, we broke, or unilaterally modified or ignored, in whole or in part, every treaty which, if honored, would have kept us on the east coast.

*Lone Wolf v. Hitchcock,* 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299, (1903), on treaties is instructive. Like *Cherokee Nation,* this United States Supreme Court case has never been overruled. *Lone Wolf* states, in part:

> The power exists to abrogate the provisions of an Indian treaty, though presumably such power will be exercised only when circumstances arise which will not only justify the government in disregarding the stipulations of the treaty, but may demand, in the interest of the country and the Indians themselves, that it should do so. When, therefore, treaties were entered into between the United States and a tribe of Indians it was never doubted that the *power* to abrogate existed in Congress, and that in a contingency such power might be availed of from considerations of

governmental policy, particularly if consistent with perfect good faith towards the Indians.

*Id.* at 566, 23 S.Ct. at 221.

*Lone Wolf* makes short work of sovereignty, in the sense that a Canada, a Mexico, or a Great Britain are true sovereigns. *Lone Wolf* makes it clear that Indian tribes are not.

> After an experience of a hundred years of the treaty-making system of government Congress has determined upon a new departure,—to govern them by acts of Congress. This is seen in the act of March 3, 1871, embodied in § 2079 of the Revised Statutes: 'No Indian nation or tribe, within the territory of the United States, shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty; but no obligation of any treaty lawfully made and ratified with any such Indian nation or tribe prior to March 3d, 1871, shall be hereby invalidated or impaired.'

*Id.*

*Lone Wolf* repeats, not the sovereign status of Indians, but their dependent status:

> In one of the cited cases it was clearly pointed out that Congress possessed a paramount power over the property of the Indians, by reason of its exercise of guardianship over their interests, and that such authority might be implied, even though opposed to the strict letter of a treaty with the Indians.
>
> * * * *
>
> It seems to us that this is within the competency of Congress. These Indian tribes *are* the wards of the nation. They are communities *dependent* on the United States.

*Id.,* 187 U.S. at 565–67, 23 S.Ct. at 221–22.

*Lone Wolf* also put to rest any idea that the land beneath reservations is not United States soil, but rather, is land belonging to a foreign or sovereign nation:

> But the right which the Indians held was only that of occupancy. The fee was in the United States, subject to that right, and could be transferred by them whenever they chose. The grantee, it is true, would

take only the naked fee, and could not disturb the occupancy of the Indians; that occupancy could only be interfered with or determined by the United States. It is to be presumed that in this matter the United States would be governed by such considerations of justice as would control a Christian people in their treatment of an ignorant and dependent race. Be that is it may, the propriety or justice of their action towards the Indians with respect to their lands is a question of governmental policy, and is not a matter open to discussion in a controversy between third parties, neither of whom derive title from the Indians.

*Id.,* 187 U.S. at 565, 23 S.Ct. at 221.

Preceding *Lone Wolf,* we had *Ward v. Race Horse,* 163 U.S. 504, 16 S.Ct. 1076, 41 L.Ed. 244 (1896), telling us

that 'a treaty may supersede a prior act of congress, and an act of congress supersede a prior treaty,' is elementary. *Fong Yue Ting v. U.S.,* 149 U.S. 698, 13 S.Ct. 1016 [37 L.Ed. 905 (1893)]; *The Cherokee Tobacco,* 11 Wall. [616] 621 [20 L.Ed. 227 (1870)]. In the last case it was held that a law of congress imposing a tax on tobacco, if in conflict with a prior treaty with the Cherokees, was paramount to the treaty.

*Id.* at 511, 16 S.Ct. at 1078.

I suggest *Lone Wolf* and *Race Horse* tell the truth.

Our attitude toward the Black Hills shows how we abandoned any pretense of the word "sovereignty" when it was deemed to be in our best interests. With the great expansion westward during the Civil War and post-Civil War era, a big public effort was made by the United States government and its military arm, the U.S. Army, to convince the Indians that westward expansion would halt at the Black Hills and that no further expansion into their territory would take place without their express consent. The Black Hills and surrounding territories, including parts of other states, were recognized as Indian territory. As settlers moved west following the Civil War, the U.S. Army and a young cavalry officer by the name of George Custer were sent to the Black Hills to protect the Indians from illegal encroachment by white settlers, at least for a while. But when gold was discovered by the Army and some white prospectors in the Black Hills, the gold rush was on, and settlers, miners, prospectors, and land speculators began to pour into what was concededly Indian territory. The U.S. government and its military arm now had an important decision to make. Would it use the Army to protect the Indians from the illegal trespass, and in the process run the risk of having to injure, or even kill, white trespassers, or would the U.S. Army, in violation of the treaty, move into the Black Hills Indian territory and protect white trespassers, while running the risk of having to injure and possibly kill Indians. We made the obvious choice.

To argue there is any vitality to the word sovereignty is to ignore history.

America and the United States, had two chances to confer true sovereignty upon Indians. The first missed opportunity was not our fault. The second was. The first opportunity belonged to Columbus, who in 1492, because of a cloudy sextant, dropped anchor in the Caribbean, and loudly proclaimed that he had found India and was now going to trade. If he had gone ashore, looked around and tried to communicate intelligently with the native people living there, he could have ordered his crew back onto the ship and said, "Come on boys, this is somebody else's land. We are turning around and going back to our home. We will tell other Europeans to stay in Europe." He did not do that.

The second time, the U.S. had the opportunity to confer true sovereignty on Indian people and Indian tribes and treat them as such. That opportunity came at the front end of our westward expansion. The Mississippi River, stretching virtually from the Canadian border south to the Gulf of Mexico and present day Louisiana was a recognizable, distinct and easily ascertainable border (just follow the river). At that time, there was even some discussion about recognizing it as a firm border between the U.S. and Indian country. But like all other discussion concerning Indian rights, it did not translate into action. We could have recognized the Mississippi as our national border just as we recognize the Rio Grande as the border be-

tween the southwestern U.S. and Mexico, or as the northern border between the U.S. and Canada is recognized. Then, whatever the Indian tribes did west of the Mississippi would have been their own business. They could have continued to roam free in small bands, or organized into counties, regions, or provinces. In other words, they would have had the same options citizens of Mexico and Canada have. But we did not. Instead, we did the following:

### 1851

Treaty of Traverse des Sioux. After years of mounting pressure from white settlers and facing huge debts to fur traders, the people of the Eastern Dakota Nation sign a treaty giving up all of their lands west of the Mississippi River. However, the U.S. Senate strikes out the provision granting the Dakota a reservation in Minnesota. Territorial governor Alexander Ramsey saves the deal by getting the president to allow the Dakota a reservation on a five-year lease. The Dakota are relocated to a strip of land bordering the Minnesota River in west-central Minnesota.

### 1858

Dakota leaders on a diplomatic visit to Washington D.C. are told they did not own the reservation land. Faced with more debt and threatened with expulsion, they are forced to sell the northern half of their reservation.

*Timeline of Events Leading Up to the Dakota Conflict and Exile,* The Native American Press/Ojibwe News, Jan. 18, 1996, at 8.

Two of Minnesota's storied historical figures, Alexander Ramsey and Henry Sibley, were leaders in this land grab of Dakota Country by Minnesota.

Another article in this newspaper shows in stark detail how after the American Indian was pushed just west of the Mississippi River, the pushing continued unabated through western Minnesota, and all of South and North Dakota (Dakota Territory), continuing into Nebraska and Montana, and finally in 1871, a part of the few tribes remaining, particularly some of the Dakota Sioux, accepted the inevitable and fled north into Canada. They did not stick around to await the inevitable, which would have been getting pushed into the Pacific Ocean!

We had the chance to confer true sovereignty upon Indian tribes in the grasp of our hands. Instead, we opted for make believe sovereignty, as we have now, and pushed forward to the west with a governmental policy, that at times involved extermination and genocide, and at other times involved pushing the Indians west, south, and north, onto the most undesirable parts of the territory and states we developed. Today, there are a few tribes whose reservations contain some valuable oil, gas, mineral, coal, and timber rights. The Navajo (Diné) in New Mexico and Arizona, the Crow in Montana, the Cherokee in Oklahoma, to mention a few, do have in some places valuable natural resources. However, this is entirely due to accident, not by design.

Ralph K. Andrist, in his book *The Long Death: The Last Days of the Plains Indian,* recounts in detail the period of westward expansion that I have just touched on.

I note that some of the precedent cited in the case before us mentions treaties as some sort of foundation for "Indian sovereignty." I join with Andrist in asking: Why did anyone pay attention to this "ridiculous pretense?" Honestly, I believe it is best that we do not bring up the term "treaty." My question would be, which one? I know of no major treaty that we have not broken. If the U.S. and its constituent states started talking seriously about treaties, I suggest we Indo–European Caucasians, African–Americans, and Asian Americans pack our bags, book passage on the next steamer, and head back to where we came from.

If treaties are to be honored, then we are on someone else's land.

The final word on treaties is best expressed by the United States Supreme Court in *Lone Wolf,* when it states that when all is said and done, Congress has complete power over Indian tribal property and Congress can abrogate the provisions of an Indian treaty at any time. *Lone Wolf,* 187 U.S. at 566, 23 S.Ct. at 221.

Reading *Cherokee Nation, Lone Wolf,* and other federal cases solemnly discussing Indian sovereignty, as if it were a viable issue, I feel as if I am in a time warp, reading *Dred Scott v. Sandford,* 60 U.S. (19 How.) 393, 15 L.Ed. 691 (1856), or *Plessy v. Ferguson,* 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256, (1896), as if these cases were still the law of the land. I note that in *Plessy,* Justice Harlan, the lone dissenter, watching the Court give continued life to separate but equal by solemnly discussing whether colored people could be kept separate from white people as long as they were "kept equal" to white people, made the same observation that I make today watching the court's solemn discussion about Indian sovereignty:

> In my opinion, the judgment this day rendered will, in time, prove to be quite as pernicious as the decision made by this tribunal in the Dred Scott Case.

*Id.* at 559, 16 S.Ct. at 1146 (J. Harlan, dissenting).

If Justice Harlan were alive today, I suggest he would state that he did not write the dissent in *Plessy.* I suggest he would state that he wrote the majority, that he wrote the law of the land, but that it took the Supreme Court and this country 58 years, until *Brown v. Board of Education* decided in 1954, to realize it. *See Brown v. Board of Education of Topeka,* 347 U.S. 483, 495, 74 S.Ct. 686, 692, 98 L.Ed. 873 (1954)(holding "separate but equal" treatment of races is unconstitutional).

The parties here are all Minnesotans, and all Americans. That gets lost in the shuffle of sovereignty. Any argument that American Indians are different from the rest of us and, therefore, are sovereign or quasi-sovereign, and reside on sovereign or foreign land, is put to rest by our actual treatment of them, and by the fact that in 1924 by the Citizenship Act, we conferred full U.S. citizenship on American Indians.

The State of Minnesota, and its residents, whether Indian or non-Indian, are not in any way, shape, or form a true sovereign. We might carelessly throw the term around, but in truth, we are not. We are individual citizens of a state that is part of a highly organized federation of states, comprising one indivisible sovereign, the United States of America. This state, and the other 49 components, might throw the term "sovereign" around at the quadrennial presidential nominating conventions, as in "the Great Sovereign State of Florida casts 42 sunshiny orange juice filled votes for candidate 'x,' the next great president of this here great U.S. of A." But after the convention we are all back to being just states within one indivisible country.

For instance, Minnesota is "sovereign or independent" of North Dakota, to the extent that on our election day, North Dakota residents (those who have no intention of changing that status), cannot pour willy-nilly across our border and vote in, or run for local and state office. But neither Minnesota as a state, nor its individual citizens, is sovereign to the point where its legislature/courts could, for instance, unilaterally declare us free of the draft should it ever be reinstated. Minnesota is not a true sovereign. The Minnesota legislature/courts cannot declare, for example, that any Minnesotan 18 years of age or older can run for president of the United States. Nor does the State of Minnesota and its legislature/courts have the power to rule that no Minnesotan can ever be president. If we had such enumerated powers, we would be sovereign. We do not, we are not. The Minnesota Indian is right there with the rest of the non-Indian Minnesotans. We are all equally endowed with the same rights, the same privileges, the same obligations, and the same limitations.

I note that waiting until 1924 to "confer full U.S. citizenship on American Indians," has to redefine "irony". The earliest anyone else in this country can claim to have relatives born here is the 17th Century.

We took this land, by fire and sword, from its owners of record, the British, who took part of it from the Indians and the French. We then took all the rest.

Most U.S. citizens trace their ancestry back perhaps 50 to 200 years. Precious few insist they have blood lineage to someone who set foot on Plymouth Rock or at Jamestown. The Anishinabe/Ojibwe trace their roots in northern Minnesota back a few thou-

sand years. Certain tribes in southwestern U.S. trace their ancestry back perhaps 10 to 20 thousand years. Whether Columbus or Viking explorers were the first European to set foot on this continent is of no consequence. The Hopi Village in northern Arizona, and the Acoma Pueblo (Sky City) in New Mexico compete for the title of the oldest continuously occupied town or settlement in the U.S. Both can show proof of an active civilization from approximately 800 to 900 A.D. to the present.

Put another way, to say that Columbus discovered America, is to state that Sri Lanka discovered NFL football.

Even the politically correct term we use today for Indians, which is "Native Americans," although accurate, is subliminally patronizing. If we feel a need to add the modifier "Native" to the term Americans, the rest of us ought to call ourselves "recently arrived" or "transplanted" Americans. If any modifier is needed preceding the term Indian, it ought to be "first American" or "real American" or "true American." That they have not been treated as such cannot deny the fact that they are. The doctrine of sovereignty that we are discussing today is a myth that never existed. Andrist and I agree, the reality of history cannot be ignored.

That American Indians should own this country, should be its true sovereigns, and would be, if history could be rolled back, is a more than an interesting issue. But history cannot be rolled back. We cannot land at Plymouth Rock and then turn around and go back east to our home. We can no longer stop at the Mississippi River, and we can no longer not occupy one foot west of it. We cannot give the Louisiana Purchase back to France and require France to give it back to the aboriginal indigenous people from whom they stole it. We cannot give Alaska back to the Russians and require Russia to give it back to the aboriginal indigenous people from whom they stole it.

Nor has it ever been seriously discussed, and I do not, whether we should undo the 1924 Citizenship Act and decide that since Indians are now not U.S. citizens, they ought to be afforded some kind of foreign national or sovereign status.

If one takes sovereignty to its natural and logical conclusion, would that mean when an American Indian immigrates off his or her reservation, would our Immigration and Naturalization Service come into play? Would Indians then need visas and passports to "come into town?" Then do we set quotas? Do we deny entry? That is exactly how we handle prospective visitors and/or immigrants from Europe, Central and South America, and other parts of the world. When you come to this country as a foreigner, a resident of a foreign or sovereign nation, you must come with an official status such, as a tourist with a passport and a temporary visa, or a work permit, or a visa for educational reasons. If you want to stay permanently, you are subject to quotas and depending on your job or occupation, your chances of gaining entry are either enhanced or decreased. With the American Indian, we do none of that. We ought not to, because we cannot. They are U.S. citizens and residents of an individual state.

I conclude we have to accept what we have done. We have to consider American Indians and their tribes as full co-equal citizens of both the United States and Minnesota. It sounds strange to say that, because of course, we ought to; they are full Minnesotans. Thus, what is strange to me, is that despite the overwhelming, undeniable fact that Minnesota Indians are full Minnesotans and full U.S. citizens, we still persist in treating American Indians on some sort of parallel tract, some sort of "separate but equal" treatment which we denounced in 1954 with *Brown v. Board of Education.* I recall that *Brown* applied to all races and colors; I do not recall any exceptions.

## II.

*Tribal Courts*

Respondent further argues that appellant's rights can be fully vindicated in the reservation or community tribal court. Upon examination, Indian tribal courts suffer from two serious deficiencies, one possibly correctable, the other lethal.

The correctable deficiency is that tribal courts are not organized (I speak now of the State of Minnesota, but the same deficiency applies to every state) under the constitution of the State of Minnesota that frames our independent judiciary. That is, Article VI of the Constitution of the State of Minnesota. Tribal courts are also not subject to Article I, Section 4 of the Constitution of the State of Minnesota which guarantees to Minnesotans "the right of trial by jury."

Also, not all Indian judges in the State of Minnesota are attorneys licensed to practice law in the State of Minnesota (they do not have to be licensed because they are not under the jurisdiction of the Minnesota Supreme Court and the Minnesota Legislature). The various tribes with tribal courts retain the right to appoint whom they want. Respondent's attorney stated at oral argument that the tribal court judges for respondent's tribal court are attorneys. But if that be so for respondent now, it is not necessarily so for respondent in the future, and it is not presently so for the various tribal courts throughout this State.

At times in our recent history, Minnesota tribal courts have had non-lawyers as judges, have had lawyers who have passed the bar in other jurisdictions, but not Minnesota, and lawyers who have never passed any bar. Indian tribal courts, unlike all other courts in Minnesota, are not under the direct supervision of the Minnesota Supreme Court. Normally, a plaintiff or defendant anywhere within the four corners of the State of Minnesota, whether a resident or non-resident, has a straight forward set of Minnesota rules and statutes that can be counted on for uniformity. The same is not true in the Indian tribal courts where the makeup, composition, rules and regulations, attitude toward state and federal precedent, and decisions when to give a jury trial or not, can and do differ.

A recent issue of *Judicature* was devoted to Indian tribal courts and justice. *See* 79 Judicature 109, Nov.–Dec. 1995. The issue was aimed at promoting the concept that they are viable and somehow can exist alongside the already established state and federal judiciaries which provide a legal forum for all citizens (Indian and non-Indian). To read the magazine is educational, but to me does nothing more than confirm the complete injustice of attempting to subdivide American citizens by race and establish parallel race-based court systems. I do not speak now of conciliation courts or alternative dispute resolution, or "talking circles." These are all forms of delivering justice to our people that must to be encouraged if we are to survive without drowning in the sea of bitter litigation and the bitter emotions that follow bitter litigation. What I am talking about is attempting to formalize a parallel Indian tribal court system purporting to have equal, and at times paramount, jurisdiction over state and federal courts.

The article entitled *Resolving State–Tribal Jurisdictional Dilemmas* is pointed, objective, and simply displays, at least to me, the insoluble incongruities, the justice denying anomalies that abound when we attempt to interject a third parallel race-based court system along side our two historical court systems. *Id.* at 154–56.

In commenting on the jurisdictional problems, the article notes the following examples:

A non-Indian father is not prosecuted for misdemeanor abuse of his Indian child on an Indian reservation because the tribe lacks jurisdiction to prosecute non-Indians, the state lacks jurisdiction to prosecute offenses involving Indians and committed in Indian country, and the U.S. attorney lacks resources to prosecute misdemeanors.

Tribal police decline to enforce a state domestic violence protective order recognized by the tribal court because they have no authority to arrest a non-Indian spouse for violating the order.

\* \* \* \*

A non-Indian spouse receives a default divorce and child custody decree in state court about the same time as the Indian spouse receives a similar decree in tribal court.

\* \* \* \*

These and similar occurrences are certainly fairly common and illustrate the

problems inherent in limitations of tribal jurisdiction. Another hypothetical provides even more food for thought: Bonnie, an Indian, and Clyde, a non-Indian who resides with Bonnie in Indian country, rob the tribal casino, receive a speeding ticket in Phoenix, rob a convenience store in California, and trespass on the beach in Mexico. They could both be fully prosecuted by all jurisdictions in which they committed their offenses except the Indian tribal jurisdiction where they reside and where they committed the most serious crime. The tribe would only prosecute Bonnie for a misdemeanor and could not prosecute Clyde at all.

Stanley G. Feldman & David L. Withey, *Resolving State–Tribal Jurisdictional Dilemmas,* 79 Judicature 109, 154–55, Nov.–Dec. 1995.

Although I respect the right of Indian tribes to move for self-determination and will address that later in this opinion, I can appreciate appellant's lawyer's desire to have his client's civil suit involving issues of negligence and serious personal injuries, heard in a neutral state court with established known rules and procedures and a history of fair dealing.

This state, this country has the power to establish Indian tribal courts in total conformity with the laws of each particular state, and in total conformity with the rules controlling our federal judicial system. Do we have the will? If we deem Indian tribal courts essential, and deem it appropriate for them to have jurisdiction within the rules, over people of all races, so that people of all races have access and do not feel intimidated, we can set them up within the framework of the Minnesota small claims or conciliation court system. *See* Minn.Stat. §§ 491A.01–.03 (1994) (establishing conciliation court system). Such a system would give a litigant direct access to state district court following an adverse decision and then full appellate review by this court, with the right of petition to the Minnesota Supreme Court. A Minnesota conciliation court gives any locality the option of handling small or local issues internally, but protects each party's right to at least one hearing de novo in state district court. We also have the power to set up a standard Minnesota district court, state or federal, as the Minnesota Legislature or Congress chooses, organized exclusively, or for the most part, with Indian issues and staffed with Indian personnel. There are zero controls or regulations forbidding governors and presidents from actively recruiting and appointing qualified minorities to the bench. Since approximately the 1970s, at both the state and federal level, qualified women and candidates of color have been actively recruited and appointed to correct imbalances on state and federal benches where the bulk, or at times all, of the appointees were white males. We have the power and the right to correct this imbalance. Do we have the will?

The deeper issue is why we are even talking about "Indian tribal courts" where a Minnesota non-Indian venturing onto a reservation, as appellant did here, can have her direct constitutional access to state district court derailed. Appellant might accept this different, and even perhaps arbitrary, treatment if she were a tourist in Canada or Mexico. But she is not a tourist anywhere in this lawsuit. She is a Minnesota resident, dealing with a Minnesota corporation concerning an accident on land in Minnesota.

There are parts of this country, counties, or regions in the deep south, parts of the southwest, and sections of our large cities, where there are large concentrations of African–Americans, Hispanic, and Asian–Americans. For example, "Chinatowns" are viable and respected sections of at least two major cities, San Francisco and New York, that have been so identified for decades. In these areas, well over 50% of the inhabitants may belong to a particular race or ethnic background. Why do we not have "African–American courts," "Hispanic courts," "Chinese courts," or "Korean courts?" Why do we not have special court systems in those areas where outsiders, that is, nonresidents, do not have automatic access to that state's district court system for redress of wrongs, but must first submit their claim to a local or ethnic court? I suggest that if we tried to establish "racially based courts," the constitutional issue of the denial of due process

issue, the race-related and race-baiting issues, and the ill-will and divisiveness that would follow would serve to overcome us as a country.

We try to go out of our way in Minnesota, and hopefully other states in the federal court system do as well, to ensure equal access and fair treatment to all people, whether plaintiffs or defendants, of any race, color, creed or ethnic origin. Why here, are we tolerating segregating out the American Indians by race and allowing them to maintain a parallel court system and further, subjecting non-Indians to it? To me, this is red apartheid. I believe this entire issue of "sovereignty" rests on true red apartheid. The American Indian will never be fully integrated into this state, nor into this country, until we recognize this "dual citizenship" for what it really is, a pancake makeup coverup of *Plessy* which allowed "separate but equal" treatment. *See Plessy*, 163 U.S. at 551, 16 S.Ct. at 1143 (holding that "equal but separate accommodations for the white and colored races" for railroad passengers was constitutional).

No further cite, other than this reference to *Plessy* is needed. I can only note, "Haven't we learned anything?"

The lethal flaw of Indian tribal courts is that they are not independent autonomous bodies. The tribal courts are not independent of the executive and legislative branch of tribal government as is needed to ensure justice for the people who come before it. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), and its progeny decided this a long time ago. *Marbury* is reference enough.

For a general review of tribal courts and the problems therein, and their differing formative stages throughout this country, I refer to Michael Taylor, *Modern Practice in the Indian Courts*, 10 U. Pudget Sound L.Rev. 231 (1987); *The Right to Counsel in Native American Tribal Courts: Tribal Sovereignty and Congressional Control*, 31 Am. Crim. L.Rev. 1279 (1994); Margery H. Brown & Brenda C. Desmond, *Montana Tribal Courts: Influencing the Development of Contemporary Indian Law*, 52 Mont. L.Rev. 211 (1991).

The essence, the sine qua non of tribal courts is that their existence *rests on sovereignty*. If sovereignty is exposed, there is no need for separate tribal courts. American Indians, like American blacks, American whites, American Asians, are already guaranteed equal access to our state and federal court systems.

The lethal flaw, the lack of an independent judiciary in Indian tribal courts, results from the fact that all tribal judges, including respondent's tribal judges, are appointed by the executive/legislative ruling body. The appointing authority for tribal judges might be called the reservation business committee, or the tribal executive committee, or the reservation board, or the community committee, but it is always the same. Those elected to run the reservation have full power to select, appoint, hire, and fire the judges. Tribal court judges may be "appointed" for a fixed term, but there is nothing inherently unconstitutional about their being fired or replaced in mid-term. They are simply not protected by the same constitution and the same rules governing Minnesota judges, not to mention the constitution and rules protecting the independence of federal judges.

The situation on reservations, including on respondent's, can be likened to a situation where the mayor and city council of St. Paul and Minneapolis select and appoint all the judges who have jurisdiction in those two cities. If there is to be county-wide jurisdiction, the county commissioners in those two counties select, appoint, set the salaries for, and hire and fire the judges. Judges in those cities or those communities, like all well-intentioned judges, would strive to do their utmost to deliver justice. But the perception of potential conflict, and the actual conflict, when the defendants in a lawsuit were the appointing authority, is too big and too dangerous an elephant to ignore. In recent years in Minnesota, an Indian tribal judge in a lawsuit found for plaintiffs who were challenging the incumbents in a tribal election. The Indian judge found enough irregularities in the election to grant plaintiffs a hearing and limited discovery on the claimed election fraud. The incumbents, the

executive/legislative branch of the tribe, whose election was being challenged, appealed to an Indian appellate court who upheld the tribal judge. The reservation business committee then fired the tribal judge.

I subscribe to three Indian newspapers: The Circle, The Native American Press/Ojibwe News, and News From Indian Country–The Native's Native Journal. One is a weekly, and two are monthly. Virtually every issue for the past three or four years has contained editorials and/or letters to the editor from residents of reservations, or those with reservation rights living off the reservation, complaining about the perceived arbitrary use of power by reservation governing bodies and the failure of the Indian tribal court to look into, let alone correct, the alleged irregularities. One such editorial contained the following comment:

> And, most telling of all, the inability of the body politic of each reservation to rectify the corruption without the aid of the United States Attorney in collateral criminal proceedings proclaims to the State of Minnesota and the United States that at least two Minnesota Ojibwe reservations do not deserve the respect of a sovereign entity.

Robert A. Fairbanks, *Leech Lake/White Earth Lawsuits Prove Disfunction of Tribal 'Sovereignty'*, The Native American Press/Ojibwe News, Dec. 14, 1995.

Another article contained the following:

> Seven members of the Turtle Mountain Band of Chippewa say their civil rights are being violated and want a federal judge to intervene in a year-long political battle.
>
> \* \* \* \*
>
> 'The tribal system is not providing remedies to members of the tribe,' said Lynn Boughey, a Minot attorney representing the seven. 'It's a state of anarchy.'

*Turtle Mountain tribal Member to File Lawsuit Against Tribe*, Native Am. Press, Feb. 2, 1996 at 1.

At times dissidents, out of desperation, have gone into the U.S. district courts for relief. That happened recently in Minnesota. A Minnesota federal district court judge ruled in October of 1995 that the federal government does have the power to overturn a Minnesota Indian tribe's vote to change its rules in such a way that would allow more people to share in the gambling profits than previously shared. *See Shakopee Mdewakanton Sioux (Dakota) Community v. Babbitt*, 906 F.Supp. 513 (D.Minn.1995). As one newspaper reported about the decision:

> The federal government has the power to overturn a Minnesota Indian tribe's vote to change its rules in a way that would allow hundreds of people to share profits from Mystic Lake Casino, a judge has ruled.
>
> U.S. District Judge Richard Kyle this week upheld a decision made in June by Ada Deer, director of the U.S. Bureau of Indian Affairs. Deer acted to nullify the referendum held in April by the Shakopee Mdewakanton Dakota Community.
>
> Questions were raised about the eligibility of some voters who stood to benefit financially from the rule change. Voters chose to waive blood requirements for descendants of current or former tribal members. Each member who is 18 or older is eligible to each receive about $500,000 a year in profits from the Prior Lake Casino.
>
> —Associated Press

*Judge: Government Can Nullify Tribal Vote*, Minneapolis Star Trib., Oct. 26, 1995, at B–3.

Recently another newspaper reported:

> Tribal officials are not immune from prosecution in federal court for criminally violating the civil rights of their constituents, according to a recent U.S. District Court opinion.

Jeff Armstrong, *Court Rejects Sovereign Immunity Claims of Indicted White Earth Officials*, Native Am. Press, Feb. 2, 1996, at 1.

Coincidentally, the reservation in question, with the voter eligibility issue, is respondent. Assumedly, the present governing body of the Shakopee reservation can appeal that decision through the federal court system. But "so much for sovereignty" and the exclusive right of tribal courts to hear disputes arising on reservations. This is an issue involving the eligibility of voters just on the reservation. Nowhere else in Minnesota. If

there ever was such a thing as a truly private tribal issue, this would be it. If there was ever an issue perfectly fit for the independent tribal courts of a sovereign nation to decide without outside interference, this would be it. To the contrary, a Minnesota federal district court has jurisdiction. Now consider that Minnesota federal district courts are not in the habit of hearing election issues arising out of local or regional elections held in Canada or Mexico. I will not do any research on that subject. I will guess that Minnesota federal district courts do not hear election issues arising out of local or regional issues in Canada or Mexico because our courts have no jurisdiction, because Canada and Mexico are sovereign nations. I will guess that a Minnesota federal district court heard an intratribal election issue on respondent's reservation because the Minnesota federal district court had jurisdiction because respondent's reservation is on U.S. land and subject to federal jurisdiction. The land might be called reservation land, or "Indian Trusts Land," but it is undeniably in America, and part of the United States of America.

This is yet one more example of why there is no real sovereignty on reservations, including respondent's. What there is, is a continuation of this ward of the government status that the U.S. government has never been able to deal with. It would be intolerable in the 1990s to even consider a system whereby all white Americans or all black Americans, or all Asian Americans, were for no reason other than color and race, designated dependent wards of the federal government. But somehow on reservations we tolerate this.

For what other classification of U.S. citizens, by color or race, do we tolerate a government agency with control over our lives. We have a Bureau of Indian Affairs (BIA), but we do not have a Bureau of Black Affairs, nor a Bureau of White Affairs, nor a Bureau of Asian Affairs, with the power to give funds, withhold funds, or permit people of that color to pursue a certain economic plan, but not others.

In speaking about our federal government's hope that somehow the BIA can make this all better without the necessity of really coming to grips with the issue of sovereignty, the myth of sovereignty as I and others call it, James Northrup, a noted Ojibwe writer and commentator from Northern Minnesota, recently had in his syndicated column, "Fond du Lac Follies" the following question and answer:

Question: Who invented the BIA?

Answer: Someone who really hated us!

The preservation of Indian tribal courts, without integrating them fully into our state and federal judicial system, is just one more bit of stark evidence that although we call Indians "Americans" (have to—they are), we treat them differently than we treat other Americans.

III.

*Preservation of Identity*

The core issue, on which I agree with respondent, is that the protection of this tribe's (or any tribe's) culture, identity, assets, religion/spirituality, and ability to live in its own way is paramount.

But I can only note that these are exactly *the same goals for all people in this state, for all colors and all races.*

Respondent's members are citizens of Minnesota and full U.S. citizens. They can be treated as such, and *must* be treated as such. But more importantly, we can protect them as citizens and still protect their inalienable right to be different, as we do now with all other religions, races, colors, and ethnic groups. We do not have to pretend that Minnesota/American Indians are "sovereign" (which really means "wards of the government") to allow them to live as they want to live.

This country not only protects identifiable religions, but does so at a tremendous cost of hundreds of millions of taxpayer dollars, taken from individuals who in fact may not belong to any organized religion. We exempt from the normal burden of commercial and residential real estate taxes recognizable churches, synagogues, mosques, etc. This amounts to hundreds of millions of dollars of a direct subsidy by state and federal taxpayers to those who belong to certain religions. In addition, members of a recognized reli-

gion, or for that matter, non-members, can give contributions to a qualified religion and have a direct deduction against their income tax and the church does not have to report that money as taxable income. This is another form of direct subsidy of millions of dollars to organized religion. We do the same for non-religious eleemosynary organizations, qualified organizations, and foundations. We taxpayers subsidize outright individuals and business entities for profit. We do this through the form of tax breaks, tax subsidies, outright grants, government loans at low interest rates, or government loans at no interest to enterprise zones, and tax increment financing. In addition, we taxpayers subsidize areas and the people living in those areas, who qualify for state and federal relief due to calamities, such as, fire, flood, drought, hurricanes, earthquakes, cyclones, etc. If you are a taxpayer not living in that area, you do not get the relief. If you are a taxpayer living within that area, you get the relief at the expense of other taxpayers.

State and federal governments subsidize townships, villages, school districts, cities, counties, and, at times, the federal government subsidizes states. We have the power, the ability, and the legal right to subsidize present day Indian reservations *within the normal framework* of how we treat other entities. Do we have the will?

Respondent wants a limited immunity to lawsuits to protect tribal assets. We do that now without calling the protected entity a reservation. In this state, townships, municipalities, local governments, etc., enjoy a limited form of immunity. We call it official and/or discretionary immunity. It has been around for decades. At times different states have considered and put monetary caps on the dollar amount that can be recovered from a municipality in a tort lawsuit. This privilege can be afforded to wealthy municipalities, when individuals, even poor ones, have no such protection. There is nothing that Indian people are entitled to as human beings that cannot be afforded them through the normal process of accepting them as brother and sister citizens. We ought to, they are.

## IV.

*Self–Determination*

Part of respondent's argument is that we need sovereignty to preserve economic self-determination and economic self-governance for tribes. I agree with that goal. But it can be done completely under the framework of present Minnesota law. For instance, municipalities have for decades been able to own and operate municipal liquor stores. Municipalities, for approximately the last 20 years, have been urged, encouraged, and pushed hard by professional sport franchises to build, own, and operate stadiums suitable for professional football, hockey, baseball, and basketball. When municipalities and cities own professional stadiums and ball parks, the taxpayers subsidize wealthy investors (mostly white males) in return for the promise of jobs and economic activity, such as bars, restaurants, and convention centers, in the hopes that tourists going through will spend two days rather than two hours in town. I do not think there is anything intrinsically evil about this. Whatever duly elected officials do, they do. I merely point this out to prove that we have the power, the right, and the precedent to allow Indian economic enterprises such as gambling casinos and other businesses to operate within the framework of existing state and federal law. Do we have the will?

If the taxpayers are asked, in various cities in various states, as they have been, to subsidize wealthy non-Indian investors, it cannot be said that it would be inappropriate for Indian casinos to continue to exist without the mirage that the land they sit on is "sovereign." Casinos provide *exactly* the same benefits that sports franchises claim they provide, i.e., jobs, economic development, and tourists who go slow rather than fast through the state.

This country has the power, the ability, and the will, to subsidize the wealthy, the poor, and the in-between. Farm subsidies are but one of many examples. It has been known for many years that a majority of the farm subsidies go to a small percentage of the larger, and thus, probably wealthier farmers in the areas of wheat, corn, sugar,

tobacco, cotton, and peanuts. This opinion does not knock that concept and does not infer that this practice should be abolished. That is a decision for the will of Congress. I simply point out that we already have, and have had for decades, a legal framework to help people who need help (and some that don't) at the expense of the rest of us. There is nothing keeping us from, again within the framework of how we treat all citizens, calling Indian reservations economic enterprise, business, or disaster zones (I suggest "disaster zones" would be poetic justice). We can extend to reservations the same tax subsidies, outright grants, low interest loans, or zero interest loans, etc., that we now give to others. Our ability to subsidize American citizens and entities, regardless of color, does not stop there. We give, through the Internal Revenue Code, hundreds of millions to billions of dollars of tax breaks to national and multi-national corporations, particularly for mineral exploration (depletion allowance) and overseas investment and trade. Put another way, why do we have to go through the pretense of calling Indians and Indian tribes wards of the government and "sovereign" entities to help them exist?

If the question arises, can we protect their unique way of life if we bring them under the same big tent that the rest of us live under? The unqualified answer is yes. We already do. For example, the lifestyle, culture, and religion/spirituality of the Old Order Amish is as specific, as culturally unique, and as different from mainstream America as any traditional Indian community, whether Ojibwe, Sioux, Cherokee, Navajo, Zuni, or Hopi. Old Order Amish in Minnesota, and in other states, live a lifestyle circa 1840–1880. Horse-drawn equipment, no electricity, kerosene lamps, lack of plumbing, a unique style of dress, and adherence to precepts that the elders of each community set are their way of life. The Amish in Minnesota are normal, full Minnesota citizens. They are normal, full U.S. citizens. They pay taxes on their land; they are entitled to go to public schools (they simply choose not to use them, but instead, maintain their own grade schools); they are entitled to vote in all elections; and they are entitled to run for public office (but choose not to). It is clear that in all ways

they live a lifestyle as foreign to the rest of us, and as culturally specific a way of life, as found on reservations in this country where tradition, ceremonies and beliefs go back hundreds of years. Yet we are able to protect them.

Despite these vast cultural differences, this state, this country bends over backward to accommodate the Amish. We do not call them wards of the government. We do not call them a dependent nation. It would be laughable to suggest that they are sovereign or quasi-sovereign. They are just as standard a citizen as those residing in Rochester, St. Cloud, Bemidji, or Hibbing, Minnesota. But we do accommodate their way of life. To protect their way of life, the United States Supreme Court exempted the Amish from the normal requirement applicable to the rest of us that we attend public or private grade schools and high schools until an arbitrary age, often sixteen. *Wisconsin v. Yoder,* 406 U.S. 205, 234, 92 S.Ct. 1526, 1542, 32 L.Ed.2d 15 (1972). In creating this exemption, the Supreme Court noted that

> [t]he purpose and effect of such an exemption [is] * * * to allow the Amish their centuries-old religious society, here long before the advent of any compulsory education, to survive free from the heavy impediment compliance with the Wisconsin compulsory-education law would impose.

*Id.* at 234 n. 22, 92 S.Ct. at 1542–43 n. 22. Thus, the Amish are allowed to attend entirely unregulated home schools from the first through eighth grades. This is the United States Supreme Court speaking.

The Minnesota Supreme Court in *State v. Hershberger* specifically exempted the Amish in Minnesota from the normal requirement applicable to the rest of us that orange triangles adorn the back of their horse-drawn buggies and farm carts to signify a slow moving vehicle. *See State v. Hershberger,* 462 N.W.2d 393, 399 (Minn.1990) (statute requiring display of slow-moving vehicle emblem violated freedom of conscience rights protected by Minnesota Constitution when statute was applied to Amish defendants, who held sincere religious belief against use of emblem, where state failed to demonstrate

that both freedom of conscience and public safety could not be achieved through alternative means of Amish defendants' use of white reflective tape and lighted red lantern).

I state the above simply to point out that this state, this country, has the power and the legal right to protect any and all parts of Indian identity, culture, tribal assets, self-determination, religion/spirituality that needs to be protected, and yet do it all within the framework of treating American Indians like we treat ourselves, as normal citizens of this state, of this country. The real issue is, do we have the will?

## V.

*Duality v. Acceptance*

The heart of the issue, to me, is that we have refused the painful, begrudging acceptance that "we are Indians, Indians are us," as we have had to accept, with painful, begrudging acceptance, the not-to-be-denied idea that we are African–Americans and Asian–Americans, and African–Americans and Asian–Americans are us.

From the moment the Mayflower dropped anchor, until this very date, we have persisted in a dual America. One America for the American Indian, the red race, and a separate America for the Indo–European Caucasian, the Afro–American, the Asian–American, the white, black and yellow race.

We should have learned by now that this duality in America is so intrinsically evil, so intrinsically wrong, so intrinsically doomed for failure, that we must grit our teeth and work through it.

Examples of failure abound. For a brief time following the outbreak of World War II, we had a dual America, one for the rest of us and one for the Japanese–Americans living on or near the west coast. All of the rest of us, and Japanese–Americans in the central and eastern part of the United States, could move and live at will. Japanese–Americans living in the west coast area could move or live at will, as long as they moved or lived in Japanese relocation camps. This was done with the full pomp and circumstance and authority of the U.S. government, backed by the full judicial authority of the U.S. Su-

preme Court. After a mercifully few short years, this practice was discontinued. Fifty years later, the U.S. government said that the practice was wrong and Congress appropriated a sum of money to identifiable descendants of those camps. Was this Asian American duality in the U.S. wrong? I can only state that when our government, with its propensity to stonewall, with its tradition of announcing that winners of a war can be guilty of no wrong, just the loser, announces that it did wrong, that it is sorry, and pays money, well, America, we were wrong. At rest now, is acceptance of the fact that a dual America for west coast Japanese–Americans and the rest of us was wrong.

In our history, we had another, much longer dual America. For approximately 90 years we had one America for white citizens and a second America for black citizens. Following the Civil War, the Thirteenth, Fourteenth and Fifteenth Amendments to the United States Constitution were quickly enacted. As a result, all white citizens and all blacks now became "full" citizens. Yet for approximately 90 years, this country officially sanctioned and officially practiced segregation. We had decades of black apartheid. Even 30 years after the enactment of those three amendments, the United States Supreme Court in *Plessy* held that, at least as to intrastate travel, separate but equal was still constitutionally permissible, proper, and in all things legal. *Plessy*, 163 U.S. at 551, 16 S.Ct. at 1143. My previous reference to Judge Harlan, the lone dissenter, calls for a further examination of that case (supreme law of the land for the following 58 years). Harlan's dissent said in places:

> But I deny that any legislative body or judicial tribunal may have regard to the race of citizens when the civil rights of those citizens are involved. Indeed, such legislation as that here in question is inconsistent not only with that equality of rights of which pertains to citizenship, national and state, but with the personal liberty enjoyed by every one within the United States.

\* \* \* \*

It was said in argument that the statute of Louisiana does not discriminate against either race, but prescribes a rule applicable alike to white and colored citizens. But this argument does not meet the difficulty. Every one knows that the statute in question had its origin in the purpose, not so much to exclude white persons from railroad cars occupied by blacks, as to exclude colored people from coaches occupied by or assigned to white persons. Railroad corporations of Louisiana did not make discrimination among whites in the matter of accommodation for travelers. The thing to accomplish was, under the guise of giving equal accommodation for whites and blacks, to compel the latter to keep to themselves while travelling in railroad passenger coaches. *No one would be so wanting in candor as to assert the contrary.*

*Id.* at 554–57, 16 S.Ct. at 1145 (emphasis added).

I can only hope that Justice Harlan's candor as to black/white duality will be recognized for its inherent truth and applied to our present duality where our white, African–American and Asian–American citizens on the one side enjoy the U.S., while on the other, and the bottom side, we have the American Indian.

Justice Harlan further said:

But in view of the constitution, in the eye of the law, there is in this country no superior, dominant, ruling class of citizens. There is no caste here. Our constitution is color-blind, and neither knows nor tolerates classes among citizens. In respect of civil rights, all citizens are equal before the law.

*Id.* at 559, 16 S.Ct. at 1146.

Until we accept the truth, the truth being that we impose this duality today on American Indians, The Pledge of Allegiance, which is supposed to read

I pledge allegiance to the flag of the United States of America and to the republic for which it stands, one nation under God,

*indivisible,* with liberty and justice for all; (Emphasis added.)

instead reads

I pledge allegiance to the flag of the United States of America and to the republic for which it stands, one nation under God, divisible into two classes of colors, one class is black, white, yellow, and the second class is red, with liberty and justice for all according to the above duality.

Between *Plessy v. Ferguson* in 1896, and *Brown v. Board of Education* in 1954, the United States continued to have its own form of a dual America, with our own form of black apartheid. Jim Crow laws were alive and well, openly in parts of this country (and subliminally in parts of others) through the tens, the twenties, the thirties, and the forties. It wasn't until approximately 80 years after the Thirteenth, Fourteenth, and Fifteenth Amendments were enacted that President Harry Truman, by executive proclamation, officially integrated the U.S. armed forces. The legally permissible principle of separate but equal, an undeniable form of black apartheid, persisted until 1954 and *Brown v. Board of Education.* At that time, the federal judiciary had a perfectly readable and articulate precedent called *Plessy v. Ferguson* to follow. It would have been easy to build on the underpinnings of *Plessy. Plessy* indicated that as long as there was equal but separate accommodations for white and colored, and as long as nobody could be denied a berth in one or the other, states could opt to do it.

Basically, *Brown v. Board of Education* was carved out of whole cloth. Despite precedent, the U.S. Supreme Court said in 1954 (inventing new law), "We just aren't going to do this any more. It is wrong. It was wrong. We don't care that we used to say it was okay. It is not okay. We are going to change it."

There was an immediate hue and cry from many members of Congress and from many states decrying this as a violation of "state's rights". Congressional action to overturn the case was discussed by a few; many legislative assemblies and state houses said "never" and set about various schemes and artifices to negate the ruling. But whether the

Oval Office liked it or not, the executive branch of the government set in force the needed justice department and military machinery to implement the dictates of *Brown.* The struggle was long, violent, and marked by bloodshed and death for the next decade, and finally, in the 1960s, civil rights and voting rights legislation put an end to the thought, held by a few, that although government and courts might say no to duality between Americans of a different color, devious ways could be devised to perpetuate the practice. We just do not allow that any more!

We have the power and the right to end the present system of red apartheid in this country, of wardship and of dependency, all cloaked in the myth of sovereignty. But, do we have the will?

*Morton v. Mancari* attempts to sidestep the bitter truth that Indian sovereignty is a race-based classification by stating that it is not race based, but is rather a "politically based difference." [1] 417 U.S. 535, 553 n. 24, 94 S.Ct. 2474, 2484 n. 24, 41 L.Ed.2d 290 (1974)(stating that preferences for American Indians are not racial but political when the preferences apply to members of federally recognized tribes).

Today, I still conclude the result reached in *Red Lake School District* was just and equitable. The entire school district was within the Red Lake Ojibwe reservation and the entire student body were residents of the reservation. But I no longer accept that part of the reasoning wherein *Morton* held that Indians are a political class, not a race or an ethnic class. If that were the case, those in Congress who were bitterly opposed to *Brown v. Board of Education* would have thought of the simple expedient of calling black Americans a political class, rather than a race-based class, and merrily continued on their way with de facto segregation. If this country is to meaningful deal with the consuming problem of race and race bias, we have to be smarter than that; we have to be more honest than that.

## VI.

### *The Economic Reality of Mystic Lake Casino*

Respondent, a corporate defendant in this personal injury lawsuit, urges that allowing appellant to proceed in state district court would interfere with its casino business, interfere with reservation/tribal business, and interfere with its "self-determination." When examined in the light of the economic realities of respondent, this argument is a non-issue. Mystic Lake Casino no more needs this preferential treatment than does a Cargill, a Dayton–Hudson, or a 3M.

Mystic Lake Casino is a full-fledged gambling casino grossing hundreds of millions of dollars per year. It took a few years of planning, and millions of dollars to construct. Its marketing plan from day one, and this must be conceded by respondent, or respondent is without candor, was *specifically and solely* designed to attract thousands of non-Indian visitors per day, thousands of non-Indian visitors per week, and hundreds of thousands of non-Indian visitors per year. Mystic Lake Casino has, to date, been successful in attracting hundreds of thousands of visitors/gamblers from off the Shakopee reservation; visitors from the metro area, visitors from around the entire State of Minnesota, visitors from out of state, and visitors from foreign countries.

Respondent's reservation contains somewhat less than 200 members. Respondent argues it is entitled to limited sovereign immunity because the casino is a "tribal enterprise." To call Mystic Lake, the largest casino in Minnesota and one in size that compares favorably with large casinos in Las Vegas and Atlantic City a "tribal enterprise," is like calling the Mall of America in Bloomington "a smallish Bloomington strip mall." The Mall of America, although available to Bloomington residents, was specifically designed and built with a marketing plan in place to attract shoppers from the entire

---

1. I have cited to *Morton v. Mancari* myself in *Krueth v. Independent Sch. No. 38, Red Lake,* when this court held that a preference for Indian Teachers with junior seniority to non-Indian teachers was appropriate under state law. *See Krueth v. Independent Sch. No. 38, Red Lake,* 496 N.W.2d 829 (Minn.App.1993), *review denied* (Minn. Apr. 20, 1993).

metro region, the entire State of Minnesota, from all our neighboring states, from virtually the entire country, and from overseas. So, too, was Mystic Lake.

If Mystic Lake were truly a "tribal enterprise," if it had not been designed, built, and specifically marketed to attract hundreds of thousands of non-Indian visitors from around the state, from around the country, it would, with its millions of dollars tied up in a building, gambling machines and fixtures, go broke in four hours, would be in Chapter 7 bankruptcy in six.

Mystic Lake's size, its scope, and its marketing plan are not accidental. They are intentional, and well done. It is a highly successful business enterprise. But it is decidedly not tribal, not local. To the contrary, it is a business designed not for the use of reservation residents, but instead, designed and marketed for non-Indian users without whose patronage it would fail immediately.

I conclude that the intentional design, size, and marketing plan of respondent constitutes a clear, express waiver of any so-called limited right not to be sued by its patrons in the appropriate Minnesota district court.

Oddly enough, under Public Law 280, if the defendant were an individual resident of respondent, he or she could be sued by appellant. Why does "sovereignty" not protect the individual Indian, a person with dignity and a life, but instead only protects a soulless corporate shell that does not need the protection? Arguably, the individual Indian deserves more protection than respondent corporation.

The cost of a basic Owner's/Landlord's liability insurance policy might be fairly expensive, given the amount of foot traffic. However, this cost is no more a burden than all other Minnesota businesses, great or small, bear.

The sovereignty issue gets muddled worse in tort cases, as we have here, than it does in contract cases, when you study the difference between "sue and be sued" versus "sue and consent to be sued" clauses. When one contracts with an Indian reservation, there is an issue as to whether the tribal constitution and/or bylaws contain a "sue or be sued" clause, which acts an express waiver of sovereign immunity, or whether it contains a "sue and consent to be sued" clause, which does not act as an express waiver. *See Rosebud Sioux Tribe v. A & P Steel, Inc.*, 874 F.2d 550, 552 (8th Cir.1989)("sue and be sued" clause in tribal corporate charter is an express waiver of sovereign immunity).

First of all, if there is no "sovereignty," the issue is moot. If you sign a contract and don't perform, you can be sued, and then given a chance to explain your actions. But even allowing for the myth of sovereignty, a contract case can be looked at differently. If one contracts with a reservation and assumes its definition of sovereignty, and signs a contract in writing that contains a "sue and consent to be sued" clause in favor of the reservation, when one suffers for that, you have only yourself and your law firm to blame.

That is decidedly not the case in the area of tort law. None of the hundreds of thousands of daily visitors, like appellant, are sat down at the front door, before plugging in their three nickels in search of the elusive "Wild Cherries," and given a written contract with bold face print, not fine print, that spells out clearly and unequivocally the following information:

> You are on an Indian reservation. We claim this is a sovereign enterprise on sovereign land. If you do not understand that, please consult your attorney. By remaining on these premises after you have read this notice, which you will sign at the bottom, you agree to accept *our* following terms and definitions. We can sue you if we think we have a case. You cannot sue us in state district court if you think you have a case unless we consent to be sued in state district court. We retain the option of forcing you to start your case in our tribal court, and we appoint the judges and make the rules for our tribal court.

> Also, be aware that this casino may or may not be subject to the Americans with Disabilities Act, may or may not be subject to OSHA regulations, may or may not be subject to state and federal laws prohibiting discrimination and harassment in the

area of gender, race, color, and creed. We state that we are sovereign and we state that we can decide to abide by the above rules or we can decide not to abide by the above rules, but no one will tell us what to decide because we claim we are sovereign.

The above is an accurate statement of the position taken by Indian casinos around this state and around the country. Some voluntarily conform to the above laws and regulations, some neglect to conform, some conform only in part, but all insist that they, and not an individual state or the federal government, will dictate to which state and federal laws they feel bound. Obviously, Mystic Lake Casino would not insist that every single person coming through the door sit down, read the statement, and then sign it before being allowed to gamble. This would have a tremendously negative impact on the number of people coming to gamble. So none of the visitors, including appellant, have carefully contracted away their right to sue. None have carefully read and accepted respondent's viewpoint on sovereignty.

What is happening here is that appellant becomes the sacrificial lamb for America's 220 years of benign neglect, and intentional neglect (including active warfare at times), of the various Indian tribes that populate, or used to populate, this country. Rather than deal with this duality, this red apartheid as I call it, we pretend there is such a thing as sovereignty, and as compensation for past wrongs, we state that appellant, a Minnesota citizen, cannot sue a Minnesota corporation in a Minnesota state court for an accident in Minnesota.

The one court that has gotten this issue right to date is the Montana Supreme Court, in *Lambert v. Ryozik*, 268 Mont. 219, 886 P.2d 378 (1994). In *Lambert*, an enrolled member of an Indian tribe brought a personal injury action in Montana state district court against a non-resident motorist for injuries arising out of a car accident that occurred within the boundaries of appellant's tribal reservation. The defendant motorist moved to dismiss the action "for lack of subject matter jurisdiction." The district court dismissed the lawsuit, believing it was guided by precedent that stated the jurisdiction of the tribal court pre-empted the jurisdiction of the state district court.

The Montana Supreme Court made short shift of the argument and stated flatly that plaintiffs (Montana Indians), as full Montana citizens, had an absolute right under the Montana Constitution to sue non-Indians in Montana state court. The court said that the failure to recognize this right to sue would deprive an Indian plaintiff of due process and equal protection of the law under the Montana Constitution. *Id.*, 886 P.2d at 380.

Minnesota bestows a similar constitutional guarantee of the right to have a jury trial in a Minnesota state court. *See* Minn. Const. art I, § 4 (stating "[t]he right of trial by jury shall remain inviolate, and shall extend to all cases at law without regard to the amount in controversy").

Appellant here, subject all day and all night to being sued in state district court by an individual Indian from Shakopee, or by respondent itself, is being denied that Minnesota constitutional right.

The *Lambert* court did, in its analysis, recognize a previous case which found in favor of an Indian defendant who wanted to defend himself in tribal court instead of state court. *Lambert*, 886 P.2d at 380. That part of the analysis was collateral and unneeded for its core holding. I suggest the *Lambert* court simply needed that part of its analysis that recognized the inherent injustice of allowing "sovereignty" to stand in the way of a Montana citizen's right to sue in a Montana court. Applying the *Lambert* analysis to appellant's rights in this case, the inconsistencies of respondent's position abound. If appellant had negligently hurt a blackjack dealer or a coin changer, that person could sue appellant in state district court. Yet, we say appellant cannot sue respondent in state district court when she was negligently hurt.

Assume that in the parking lot of respondent, appellant, with passengers in her car, collided with a vehicle belonging to the Mystic Lake Casino and being driven by a tribal member. The driver could sue appellant in state district court. The passengers in appellant's vehicle could sue appellant in state

district court. Respondent could sue appellant for property damage in state district court. Are we to say that appellant, for her own injuries, has to counterclaim against the driver, and cross-claim against him for injuries her passengers received, in tribal court?! Do we have parallel lawsuits? What if this lawsuit and/or appeal from state district court finds negligence on the part of the driver of the reservation car, but the judgment in tribal court finds negligence on the part of appellant. Whose judgment is higher? Whose judgment gets enforced?

Our case today is founded upon a claim of "sovereignty" which does not now exist, nor has ever existed, in any true sense of the word. Even *Cherokee Nation* acknowledged the lack of true sovereignty on the part of Indian tribes. Somehow the word crept into our vocabulary. I suspect it crept in as a pacifier for unrighted wrongs against Indian people, against Indian tribes.

The tribal courts throughout this state, throughout this country, are not a reliable and predictable forum for citizens to sue each other in, nor a place to seek redress and due process. If there is a need to preserve an Indian tribal court system, I have no quarrel. This state, this country, is moving toward an era of alternative forums for dispute resolution. But to wipe out the racial bias our Minnesota Supreme Court declared found in our court system, an Indian tribal court must be open to all, organized pursuant to the Minnesota statutes controlling conciliation courts, district courts and appellate courts, and organized under the auspices and rule of the Minnesota Supreme Court regarding the training and discipline of attorneys and judges.

*Anything less would be a pure race-based distinction, and no Minnesotan, regardless of color, not volunteering to enter a court system based on race and take their chances, should be forced to do so or lose their right to sue.* But this is precisely what respondent urges on this court. I disagree strongly. It is difficult to sanction a Tribal Court and declare it to have jurisdiction over Minnesotans, both Indian and non-Indian, when the Tribal Court is a pure race-based classification. The appointing authority for the judges of the Tribal Court is the Reservation Business Council, which is, by definition, composed only of those meeting a race-based qualification. This Council may, if they choose, appoint non-Indian judges to the Tribal Court, but they reserve to themselves the right to make appointment to the Tribal Court a race-based classification. In addition, the Reservation Business Council, if respondent's position is accepted, retains the right to sue other races (non-Indian) in Minnesota district court, but then has the power to declare that other races (non-Indian) do not have the right to sue respondent in Minnesota district court, unless respondent first consents.

How do we accept the incongruity, the injustice, that residents of respondent's reservation, and respondent itself, have the option of exercising their Minnesota constitutional right to sue initially in state district court, but that appellant does not? She is, like they, a Minnesotan resident.

The truly important goals of protecting Indian culture, Indian spirituality, self-determination, their freedom, and their way of life can be done within the same framework and the same system, by which we treat all other Minnesotans of all colors. This country has failed miserably at maintaining dual Americas. At one time, we maintained one America for white and one for certain Japanese–Americans. At another longer time, we maintained one America for white Americans and another America for black Americans.

For some reason, we continue to insist that American Indians can be the last holdout, a race that is not entitled to be brought into the fold, can be left to shift for themselves as long as, from time to time, we pat them on the head like little children and call them sovereign. "Sovereignty" is just one more indignity, one more outright lie, that we continue to foist on American citizens, the American Indian.

Like Justice Harlan, the dissenter in *Plessy,* I am out of excuses and simply can no longer defend the status quo.

The most attractive and compelling argument made by respondent is that they need this sovereignty for Indian "self-determina-

tion" and Indian "self-governance." When we read and hear this phrase, all of us, like myself, who push for the self-determination and independence of all, particularly the poor and the formerly poor, would think it to be a great argument and reason enough to continue the myth of sovereignty. That is, unless we look into the very phrase itself and say, "Self-determination for whom? Don't all residents of this state already have it to the same degree as all others? Are not members of respondent's tribe residents of this state?"

All bona fide residents of Minnesota, of all races and colors, enjoy identical opportunities 'for self-determination and self-governance. All of us enjoy the same access to public schools. All of us of voting age enjoy the same access to the polls. All of us of electable age and with no legal disability enjoy the same opportunity to run for office. None of us can be denied an opportunity to apply for a job, or be kicked off a job, if we have one, purely because of race or color. Those same guarantees already do, and must, apply (whether you live on a reservation or not) to all American Indians in Minnesota. Minnesota Indians, like the rest of us, are Minnesota citizens.

Why is there this need to single out a class of people by race and give them a "double dose" of self-determination, and self-governance? Without this fiction of sovereignty, they still have every right we possess, every right that the State of Minnesota can give. Are American Indians entitled to "more self-determination" than Minnesota gives to its other residents? I am not sure how this could be. How can a state give more than it possesses?

If this is deemed a federal issue, how does the federal government give more than it possesses? Under the United States Constitution, all citizens of this country of all races already enjoy the same rights and the same access to the federal court system to enforce those rights.

Why does the federal government select one class of people by race and feel it necessary to give them "double self-determination and self-governance." Double in the sense that they have the rights of all U.S. citizens, but now there is supposed to be another right because they are Indians? Does that make Indians separate but equal? I suggest that *Brown v. Board of Education* will tell us this is a bad idea, a vicious and humiliating idea.

Do we label Indians "separate but more equal?" That would not personally bother me, as the American Indian is entitled to some pay back for our treatment of them since this country was founded. But, can we really single out a class of Americans by race and deem them separate but more equal, without running into the same vicious firestorm of hate and divisiveness that prompted the *Brown* Supreme Court to state that the *Plessy* Supreme Court was all wet, all wrong, and cry out, "we aren't going to do that any more."

Do we label Indians "separate but less equal?" I suggest that one will not get off the ground if "separate but equal" cannot.

This case, this issue, is not about who can round up the most dried out musty federal precedent [2] for one side or the other. This case, this issue, is about the future of the United States, and the future of the American Indian. This case is about whether we accept the American Indian as a full U.S. citizen, a real American, or whether we will continue to sanctify tiny enclaves within a state and tell the individual Indian that if he or she stays there and does not come out and live with the rest of us, we will bless them with the gift of "sovereignty."

In all honesty, I am satisfied that respondent, respondent's attorneys, and members of respondent's reservation realize and accept that they are full-blown Minnesota residents, full-blown U.S. citizens, and are not really a true sovereign nation or country in any real sense of the word. I know they know that, and I know they accept that be-

---

**2.** It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have van-

ished long since, and the rule simply persists from blind imitation of the past.
Oliver Wendell Holmes, *Path of the Law,* 10 Harv.L.R. 457, 469 (1897).

cause they continuously demand and exercise all the rights and privileges of being Minnesotans and Americans. They vote, they run for public office. The Minnesota Legislature's state senator from Senate District 4, is and has been, an enrolled member of the Leech Lake Ojibwe Reservation and a resident thereof for years. He repeatedly has signed affidavits of candidacy for the Minnesota Senate declaring himself to be of age, to be a Minnesota resident, and to be a resident of the senatorial district from which he files. That district includes both the Leech Lake reservation *and non-Indian lands.* The Minnesota Legislature at all times holds out to all residents in Senate District 4 that they are bona fide citizens of the State of Minnesota. At no time does the Minnesota Legislature advise Minnesotans living in Senate District 4 that part of that district is foreign or sovereign country, nor does the Minnesota Legislature advise residents of Senate District 4 that they may be governed by a foreign national of a sovereign nation.

The senator from the Leech Lake Reservation is a full Minnesotan, and is completely qualified and completely eligible to run for his senate district and all other local and state offices. All other Minnesota Indians in this state enjoy identical qualifications and eligibility to run for public office, from local right on up through the president of the United States.

In addition to being eligible to serve in the Minnesota Senate and the Minnesota House of Representatives, Minnesota Indians are fully eligible and, if qualified, to file for or be appointed to any of Minnesota's constitutional offices, including state and appellate court judicial positions. Further, they are eligible to run for one of Minnesota's eight seats in the United States House of Representatives, or our two state-wide United States senatorial positions. I can only note that membership in the Minnesota legislature, the Minnesota judiciary, the Minnesota delegation in Congress, the federal bench, the United States Supreme Court, and the office of President of the United States, is not often extended to foreign nationals of true sovereign nations.

Respondent, and its members, routinely exercise their rights of access, as Minnesotans, to Minnesota district courts and Minnesota federal district courts. They take advantage of the option of sending their children to the public schools of Minnesota. They lobby the Minnesota legislature and raise money (legitimately) for PACS to promote their own self-interest, and in all other things enjoy the same rights and privileges open to Minnesota residents and Minnesota businesses, regardless of race or color.

What respondent's attorneys are really after is a race-based economic preference that other races in Minnesota do not have. I do not quarrel with their right to be here on appeal. Ethical attorneys are required to support their client's cause, and when stuck with the facts and stuck with the law, they have no choice but to put their client's best foot forward. Here, that means cloaking their client's request for a race-based economic preference in the historical myth of "Indian sovereignty."

I hope I have been able to set out in this opinion that history, not myself, has marshaled the most compelling argument possible that Indian sovereignty never existed and does not now exist. If the only issue were an argument that perhaps out of all the different races in Minnesota, if any one could justify being singled out for preferential treatment, it would be the American Indian, I would have written a whole different opinion. History would marshal the argument, "Hey, America, its pay back time." But that is not the issue, as it cannot be, as pure race-based distinctions are an area this country has done so poorly in, we put them aside for fear of divisive and hate-filled bias resurgence. The issue is, instead, "can we do what needs to be done for Indian tribes and for individual members, and can we do it legally?" The answer is a simple unqualified "yes."

As I have set out in this dissent, the machinery is in place on the state and federal levels, and has been so for decades, for hundreds of years, to treat all we citizens, all we Americans, subject to the reality of our limited resources, with all the care, respect, and compassion that we can give. Other than

that, we cannot do, as no state, no country can give what it does not possess.

If we follow respondent's reasoning, it, as a reservation, is entitled to be a private, sanctified enclave with the extraordinary privilege of not having to answer for its alleged acts of negligence in a Minnesota district court. I am simply not persuaded.

How many private enclaves within this state, within this country, do we want to establish before we realize we are Balkanizing America? At last count there were 500 to 600 federally recognized tribes. That begs the question of why should a white government get to designate who can be a real Indian tribe and who cannot be. Anthropologists, linguists, and serious students of Indian culture conclude there may be as many as 2000 different distinct groups of Indian people, some small and some larger, with a separate and identifiable culture, way of life, or language. The lower number of 500 to 600 is expanding with the push for economic development, with or without gambling, as unrecognized bands or tribes are petitioning the federal government for recognition as yet another "sovereign nation."

Whether we have 500 to 600 (and growing) federally recognized tribes, or 2000 or more (and growing) distinct tribes, we should talk to Yugoslavia about Balkanization. Yugoslavia no longer exists.

This is not a case of finding room for the great waves of European immigrants that this country experienced between roughly 1800 and 1920. Everyone involved in this issue is already here! The one race or tribe or ethnicity that does not immigrate to America, by definition, is the American Indian.

We simply need to provide for these fellow citizens, who have been with us always, and with us a lot longer than we have been with them, and treat and respect them with the laws already on the books for the class of people we call "Minnesota Americans."

Respondent in this case, a defendant in a personal injury case, is a multi-million dollar casino with millions of dollars in revenues and millions of visitors over its short lifetime. Respondent was designed specifically for, and marketed specifically to non-Indian visitors from outside the reservation. *That has to be the clearest economically based express waiver of any claim of immunity that I could design, if asked to be the architect of such a waiver.*

I respectfully dissent for all of the above reasons, and would remand this case to the appropriate Minnesota district court to continue. It would be Minnesotan against Minnesotan, in a court trained to handle such matters. No harm will be done.